**ZUMBRO, INC., a Minnesota corporation, Plaintiff,**

v.

**MERCK AND CO., INC., a New Jersey corporation, Defendant.**

**No. 90 C 2507.**

United States District Court, N.D. Illinois, E.D.

March 4, 1993.

George Pellegrin McAndrews, McAndrews, Held & Malloy, P.C., Chicago, IL and Edward W. Murray, Merck & Co., Inc., Rahway, NJ, for defendant/counterclaimant.

Paul William O'Malley, Jr., Walsh, Case, Coale & Brown, and Ralph Everett Brown and Judith L. Borden, Schuyler, Roche & Zwirner, Chicago, IL, for plaintiff/counterdefendant.

## ORDER

NORGLE, District Judge.

Before the court is Magistrate Judge Rebecca R. Pallmeyer's 83-page Report and Recommendation (the "Report"), dated November 13, 1992, which recommends: (1) granting Merck's motion for summary judgment asserting that all claims of Zumbro's patent are invalid on account of the inventors' failure to comply with the best mode requirement of 35 U.S.C. § 112; (2) or alternatively, granting Merck's motion for summary judgment asserting that all claims of Zumbro's patent are invalid on account of the inventors' pre-critical date commercial activity (the Unifiber sale) under 35 U.S.C.

§ 102(b); and (3) denying Zumbro's motion for summary judgment asserting that its patent is presumptively valid and has been infringed.

The court has made a *de novo* review of the Report, 28 U.S.C. § 636(b)(1), and finds it to be thorough, accurate, and the decision proper. Furthermore, neither party has filed any objections to the Report, and consequently, such failure to object constitutes a waiver of the right to appeal this decision. *Egert v. Connecticut General Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir.1990). Accordingly, the Court adopts and incorporates Magistrate Judge Pallmeyer's Report pursuant to 28 U.S.C. § 636(b)(1) with the following modification.

The Report correctly states that if the court adopts the Magistrate Judge's first recommendation, granting summary judgment in favor of Merck on the "best mode" grounds, it need not consider issues relating to the other motions because granting summary judgment is dispositive of this case. However, because the Report is thorough, accurate, and supported by the record, the court adopts the Report's recommendations as to each issue decided by Magistrate Judge Pallmeyer. Therefore, Merck's two summary judgment motions as to the validity of the patent claim in question are granted, and Zumbro's summary judgment motion is denied.

The court is aware that Merck had filed an additional motion for summary judgment of non-infringement. Although the Report states that "Merck has presented substantial support for a summary judgment in its favor on this issue," it nevertheless fails to make a "firm recommendation regarding this motion." Because the Report lacks a recommendation as to this issue, and because the court adopts the recommendation that summary judgment be granted in favor of Merck on other bases, Merck's motion for summary judgment on non-infringement is denied as moot.

TABLE OF CONTENTS

Standard for Summary Judgment in a Patent Case .......... 1395
Factual Background .......... 1395
The Patented Process .......... 1395
The Parties .......... 1396
Merck's Motion for Summary Judgment on Grounds of "Best Mode" Violation .......... 1397
A. Facts Relating to Best Mode .......... 1397
B. Analysis of "Best Mode" Motion .......... 1399
1. Standards for Proving Violations of Best Mode .......... 1399
2. Analysis of the '938 Patent .......... 1400
a. Failure to Disclose Operating Parameters of the Glatt WSG 120 .......... 1402
b. Whether Zumbro Has Shown a Genuine Dispute of Material Fact .......... 1405
Recommendation .......... 1407
Merck's Motion for Summary Judgment on Grounds of Violation of "On Sale" Bar of 35 U.S.C. § 102(b) .......... 1407
A. Facts Relating to "On Sale" Motion .......... 1407
1. Run No. H132001 .......... 1408
2. The Unifiber Product .......... 1409
B. Analysis of "On Sale" Motion .......... 1409
1. Standards for Proof of "On Sale" Activity .......... 1409
2. Analysis of Defendant's Claim that Sander and Cook Violated the "On Sale" Bar of 35 U.S.C. § 102(b) .......... 1410
a. Did IFP Offer Its Custom Processing for Sale by Providing Kelco with a Sample of the Product of Run No. H132001? .......... 1411
b. Was Run No. H220801 (Unifiber) Produced by the Method of Claims 1 and 15 of the '938 Patent? .......... 1413
(i) ¶ 27 of Merck's Local Rule 12(m) On Sale Statement .......... 1415
(ii) ¶ 28 of Merck's Rule 12(m) On Sale Statement .......... 1416
Recommendation .......... 1416
Motions For Summary Judgment of Validity, Infringement and Non-Infringement .......... 1416
A. Facts Relating to Validity and Infringement .......... 1417
B. Analysis of Zumbro's Motion for Summary Judgment of Validity .......... 1417

1. Pertinent Prior Art Patents Not Considered by the Patent Examiner ... 1418
2. Invalidity of Claims 26 and 27 Based on Uncited Pertinent Prior Art ... 1419
3. IFP's Agglomeration for T.J. Lipton Prior to the Critical Date ... 1419
Recommendation ... 1420
C. Analysis of Zumbro's Motion for Summary Judgment of Infringement ... 1420
1. Standards for Summary Judgment of Infringement ... 1420
a. Literal Infringement ... 1420
b. Claim Interpretation ... 1420
(i) The Meaning of "Intermittent Spraying" ... 1421
(ii) Internal Operation of the WSG Process and the GPCG Process ... 1422
(iii) Absence of Particulate Carrier in Keltrol RD ... 1422
D. Analysis of Merck's Motion for Summary Judgment of Non-Infringement ... 1423
1. Whether Zumbro's Claims Require Both a "Vegetable Gum" and a Separate "Food Grade Particulate Carrier" ... 1423
2. The Specification's Differentiation of "Particulate Carrier" and "Vegetable Gum" ... 1424
a. Definition of "Food Grade Particulate Carrier" ... 1424
b. Function of the Food Grade Particulate Carrier ... 1425
c. May Limitations Be Read into the Claims? ... 1425
3. The Inventors' Admissions Concerning the Specification's Silence about "Vegetable Gum" Constituting a "Particulate Carrier" ... 1426
4. The Prosecution History of Claims 26 and 27 ... 1427
5. Cancelled Claim 17 ... 1428
Recommendation ... 1429
CONCLUSION ... 1429

---

***REPORT AND RECOMMENDATION***

PALLMEYER, United States Magistrate Judge.

Plaintiff Zumbro, Inc. ("Zumbro") filed its complaint on May 1, 1990, pursuant to 28 U.S.C. §§ 1338(a) and 1400(b) to recover compensation for use of its patented invention by Defendant Merck and Co., Inc. ("Merck"). Zumbro is the owner of U.S. Patent No. 4,557,938 (the '938 patent), entitled "Product and Process for Improving the Dispersion of a Vegetable Gum in Water," and issued December 10, 1985 by assignment from the co-inventors of the patent, Eugene H. Sander and Douglas R. Cook. On June 5, 1990, Defendant filed its answer, affirmative defenses, and counterclaim. Plaintiff filed its reply to the counterclaim on June 26, 1990. Plaintiff amended its complaint on September 14, 1990.

Merck has filed three motions for summary judgment. Two of the motions assert that Zumbro's patent was rendered invalid by acts or omissions of the inventors prior to applying for the patent. One of these motions argues that the inventors' failure to disclose the "best mode" of carrying out the invention, as required by 35 U.S.C. § 112, renders the patent invalid and unenforceable. In a second motion, Merck seeks summary judgment of invalidity of the '938 patent on the ground that the method of that patent was allegedly commercially exploited prior to the statutory one-year grace period set forth in 35 U.S.C. § 102(b). The third motion asserts that, even if the patent is valid, Merck has not infringed any of the allowed claims of the patent. Plaintiff Zumbro has filed its own motion for summary judgment, asserting that its patent is presumptively valid and has been infringed.

This case was originally assigned to Judge Brian B. Duff. It was reassigned to Judge Charles R. Norgle on May 8, 1991. Judge Norgle referred the case to Magistrate Judge Elaine Bucklo on June 14, 1991 for all pre-trial matters. The referral was transferred to these chambers pursuant to order of the Executive Committee dated October 10, 1991.

The parties' four motions have generated a voluminous record and raise complicated issues. Although a ruling on any of the four motions would be dispositive, this Report

nevertheless addresses each motion in some detail.

***Standard for Summary Judgment in a Patent Case***

Summary judgment in a patent case, as in any other type of case, is appropriate when there are no genuine issues of fact and the movant is entitled to judgment as a matter of law. *Jamesbury Corp. v. Litton Indus. Products, Inc.*, 839 F.2d 1544, 1548 (Fed. Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988); *Flow–Rite of Tennessee, Inc. v. Sears Roebuck & Co., Inc.*, 20 U.S.P.Q.2d 1361, 1991 WL 144158 (N.D.Ill. 1991). The moving party bears the burden of demonstrating the absence of all genuine issues of material fact. *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1116 (Fed.Cir.1985). In deciding whether a genuine issue of material fact exists for purposes of summary judgment, a court should look beyond bare arguments and resolve any doubts over issues of fact in favor of the party opposing summary judgment. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 973 (Fed. Cir.1985). When the movant has supported his motion as provided by FED.R.CIV.P. 56(c), however, the opposing party must come forward with evidence directed to specific facts showing that there is a genuine issue for trial. FED.R.CIV.P. 56(e). Mere denials or conclusory statements are not sufficient. *Jamesbury Corp.*, 839 F.2d at 1548.

## *FACTUAL BACKGROUND*

The parties have submitted separate Local Rule 12(m) and 12(n) Statements for each of the four motions for summary judgment.[1] The following discussion begins with a description of background facts relevant to all of the motions. Facts relevant to each motion are then presented separately.

***The Patented Process***

The invention that is the subject of this litigation involves a process for increasing the rate and quality of dispersion of a vegetable gum[2] in water. One type of vegetable gum used in this process is xanthan gum.[3] The process has applications in the instant powdered food industry, where it can be used to enhance the solubility of powdered foods, such as instant soups or gravies, in water. The addition of a vegetable gum powder to water frequently results in the lumping of gum particles into a gel-like substance, wet on the outside, dry in the center. The lumps result from competition between gum particles for available water, for which many gums have strong affinity. Such lumps, referred to as "fisheyes,"[4] are extremely resistant to dispersion even upon vigorous agitation or cooking. (Zumbro's 12(n) Best Mode Statement, ¶ 50.) One of Merck's own patents, in fact, states that "[a] difficulty with many of these compounds [e.g. polysaccharides] is that the more soluble they are in water, the more non-dispersible they are...." (I. Cottrell, et al. "Dispersible Xanthan Gum Blends," U.S. Patent No. 4,363,669, Dec. 14, 1982, Ex. J. to Zumbro's 12(n) Best Mode Statement, col. 1, ins. 19–21.) Another Merck patent states that "[t]ypically, xanthan gum powder must be subjected to high agitation, as in a typical

1. Although Merck inadvertently labelled its Statements of undisputed material facts as conforming to Local Rule 12(1), this Report refers to those submissions as Merck's Local Rule 12(m) Statements.

2. Vegetable gums are polysaccharides, or complex carbohydrates that can be decomposed by hydrolysis into two or more molecules of monosaccharides. Gums are hydrophilic (having an affinity for attracting, adsorbing, or absorbing water). Gums swell upon exposure to waters to produce a viscous dispersion or solution. (Ex. Y to Zumbro's 12(m) Infringement Statement.)

3. Xanthan gum is a derivative product from a naturally occurring polysaccharide. (Baird et al., "Dispersible Xanthan Gum," U.S. Patent No. 4,654,086, Mar. 31, 1987, Ex. R to Zumbro's 12(m) Infringement Statement, col. 1, lns. 32–36.) Xanthan gum is an emulsifying agent in relation to water and oils. (Wintersdorff, "Clabber-Free Xanthan Gum," U.S. Patent No. 4,269,-974, May 26, 1981, Ex. Q to Zumbro's 12(m) Infringement Statement, col. 2, lns. 3–15.)

4. "Fisheyes" refers to the cluster of gum particles that develops when vegetable gum is not properly dispersed into water. Fisheyes result from localized surface wetting of a cluster of gum particles with the cluster having a dry center. The fisheye formation sometimes appears with dry soup or powdered drink mixtures, where the mix does not properly disburse into water.

kitchen blender, to get it to disperse and hydrate." (J. Baird, et al. "Dispersible Xanthan Gum," U.S. Patent No. 4,654,086, Mar. 31, 1987, Ex. K to Zumbro's 12(n) Best Mode Statement, col. 1., lns. 13–15.)

Once dispersal of a gum is achieved, however, hydration [5] of the gum, as evidenced by the development of viscosity, is usually quite rapid. (F. Maske et al., "Dispersible Glyoxal–Xanthan Gum Complexes," U.S. Patent No. 4,041,234, Aug. 9, 1977 ("234 Patent"), Ex. S to Zumbro's 12(m) Infringement Statement, col. 1, lns. 25–27.)

The invention of the '938 patent relates to one of many methods for agglomeration. Claims 1 [6] and 15 [7] of the '938 patent are independent (i.e., claims which do not refer to any other claims for support and which stand alone; and both claim a method). In the '938 patent, Claims 1–12 and 15–27 are directed to a multi-stepped process that begins with two types of particles: a "food grade particulate carrier" and "vegetable gum particles." The product that is produced by the method of the '938 patent is an "agglomerated particle."

According to the terms of the patent, the process involves dry blending a vegetable gum in a fluid bed dryer with a food grade particulate carrier, such as starch, to form a dry blended mixture. The dry carrier-vegetable gum mixture is then "fluidized" with a gaseous air stream and sprayed intermittently with a fluid so that the vegetable gum and the carrier particles are wetted. Intermittent spraying and drying of the fluidized mixture allows the carrier and vegetable gum particles to dry while in contact with each other, thereby "agglomerating" vegetable gum and carrier particles with each other. The resultant agglomeration of vegetable gum and starch or equivalent particles increases the rate at which the gum will disperse within an aqueous solution and virtually eliminates the formation of "fisheyes" in the solution. Ultimately, the process results in the agglomeration of vegetable gum/carrier particles that have a moisture content below approximately 25 percent by weight.

### *The Parties*

Plaintiff Zumbro is a Minnesota corporation, having its principal place of business at Hayfield, Minnesota. Zumbro is the assignee of Eugene H. Sander, an inventor and prior assignee of Douglas R. Cook, also an inventor. Both Sander and Cook are listed on the face of the '938 patent as its co-inventors. At the time Sander and Cook reduced their process of invention to practice in November 1981, Sander was a one-third shareholder of Innovative Food Processors ("IFP") (not a party to this litigation). Defendant Merck has its regular place of busi-

5. Hydration refers to the incorporation of molecular water into a complex molecule with the molecules of another species. (McGraw–Hill Dictionary of Scientific and Technical Terms, Ex. Y to Zumbro's 12(m) Infringement Statement.)

6. Claim 1 reads as follows:

1. A process for producing a particle having a vegetable gum component, the particle being characterized by quick dispersion in an aqueous solution, the process comprising:

dry blending a food grade particulate carrier and vegetable gum particles to obtain a dry blended mixture;

fluidizing the carrier/vegetable gum mixture with a gaseous stream;

intermittently spraying the mixture with a liquid spray while the mixture is in a fluidized state causing the surfaces of the particles to become tacky and the particles to stick to each other;

permitting the particles to dry between spraying intervals; and

continuing spraying and drying of the particles until agglomerated particles are produced having a moisture content of less than 25% by weight of the agglomerated particle.

7. Claim 15 reads:

15. A process for preparing an agglomerated particle having a vegetable gum component, the particle characterized by its quick dispersibility and dissolution into an aqueous solution, the process comprising:

agglomerating vegetable gum particles with a food grade particulate carrier in a fluidized bed dryer by fluidizing the particles with a gaseous stream and intermittently spraying the vegetable gum particles and the particulate carrier rendering surfaces of the particles and the particulate carrier tacky and then permitting partially agglomerated particles to dry between spraying intervals to produce a finished agglomerated particle wherein the carrier and gum particles are bound to each other and the finished agglomerated particles having a moisture content below approximately 25% by weight of the agglomerated particle.

ness at Chicago, Illinois. The Kelco division of Defendant Merck, at various times, was a supplier of unagglomerated xanthan gum to IFP and Zumbro. (Zumbro's 12(n) On Sale Statement, ¶ 57.)

### *MERCK'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF "BEST MODE" VIOLATION*

#### A. Facts Relating to Best Mode

The inventors' purpose for developing the process whose patent is challenged here was to overcome the poor dispersion characteristics of vegetable gums in water. (Merck's 12(m) Best Mode Statement, ¶ 54, Zumbro's 12(n), ¶ 54.) Eugene Sander, one of the co-inventors, holds a Ph.D in food science, has taught at the University of Minnesota, and performed technical services for General Mills and for Grain Processing Corporation. At General Mills, Sander worked on improving the dispersibility of gums such as algin gum. Sander joined Grain Processing Corporation in 1978, and served as its Vice President of Technical Resources until March, 1983, when he left Grain Processing to devote full time to his own business, IFP, in Hayfield, Minnesota. Sander became involved in agglomerating maltodextrin for Grain Processing on Aeromatic, Glatt, and Freund fluidized bed dryers in 1980. During the summer of 1982, according to his deposition testimony, Sander was "still learning a lot about how to mechanically operate the system." He had encountered problems requiring adjustments to nozzles and air pressures within the fluid bed equipment. Sander recognized that agglomerating gum and particulate carrier in the Glatt WSG 120 [a fluid bed dryer] was not a simple process: "[Y]ou can't predict with every product [that is put into the Glatt WSG 120] that you will have success." (Ex. 4 to Merck's 12(m) Best Mode Statement, at 247.)

Douglas Cook, the other co-inventor, obtained his M.S. degree in food science and nutrition from the University of Minnesota in March 1981. He started working with IFP in June 1981. Cook learned how to operate the Glatt WSG 120 from Sander and from his own trial and error.

The agglomeration process described in the '938 patent was first performed in a commercially available device manufactured by Glatt Air Technologies, Inc. ("Glatt"), known as the Glatt WSG 120 fluid bed processing system. Sander, doing business as a corporation named DSCS [Droogsma, Sander, Chappell, Salonek] Corporation, had purchased the Glatt WSG 120 in May 1981 and leased it to IFP. The Glatt Instruction Manual contains schematics, explanations of functions, descriptions of controls, and a general explanation of the process of granulation or agglomeration as performed on the Glatt WSG. The Manual was not, however, a complete source for the "rules of thumb" or the standard operating conditions for performing agglomeration processes with the Glatt WSG 120. Indeed, the Manual directs the operator to determine the best operating conditions to obtain the optimum agglomeration: "In order to obtain best results, one must find out the most suitable way." (Ex. 7 to Merck's 12(m) Best Mode Statement, at 05-004.)

Adjustments of the spray nozzle, nozzle height, atomization air pressure, and other conditions in the Glatt WSG 120 affect the size and pattern of the spray zone in the fluidized bed. Fluidizing air pressure may range from one (1) bar pressure (atmospheric pressure of 14.7 lbs./square inch "psi"—the pressure of an inflatable pool toy) up to six (6) bar pressure (6 times atmospheric pressure, or 88.2 psi—the pressure in a racing bicycle tire). The spray nozzle sprays in a cone or zone, and particles passing through that zone will come into contact with the liquid. The angle setting on the spray nozzle changes the angle on the spray pattern, and is adjustable from its full closed position up to four 360 degree turns (1440 total degrees). The nozzle height is adjustable above the bed height from about eighteen inches down to zero inches. Control of agglomeration is achieved through adjustments of these parameters—for example, adjustments of the nozzle height or the atomizing air pressure. (Merck's 12(m) Best Mode Statement, ¶¶ 12.1-12.4.)

At his deposition, Inventor Cook testified that certain operating conditions were "criti-

cal" to the operation of the agglomeration process. He admitted that the patent did not specify the majority of such conditions or parameters. Among his list of twelve critical parameters, Cook identified various operating constants (i.e., pump type, nozzle height, port size, angle setting, atomization air pressure, spray interval, and shake interval) and operation conditions (i.e., inlet temperature settings, pump speeds (rpm), damper settings, total process time, and the composition of the binder). Cook admitted that the patent disclosed only four of the critical parameters: inlet temperature, total process time, spray interval, and shake interval; the other eight were not listed. (Ex. 5 to Merck's 12(m) Best Mode Statement, at 130–32, 144–53.) One of the disclosed parameters in fact was incorrect; the spray interval utilized in the patented process was actually twenty-five seconds rather than thirty-five seconds, as reported in the patent.[8] Cook acknowledged the inaccuracy of this step of the agglomeration process, due either to a drafting or typographical error; if this step were followed, the process would not function as described in the patent.

IFP customarily filled out a record called a "process data" sheet for each agglomeration process performed on the Glatt WSG 120 by recording the amount and composition of materials to be agglomerated; the composition of the binder solution; and the various operating constants, operation conditions, and comments regarding the success of the run. The entries on the process data sheet for Run H132001, which represents the first agglomeration of gum and particulate carrier performed on the Glatt WSG 120 in November 1981, note the optimal settings and adjustments to the Glatt machine known to Sander at that time. After November 1981, Sander operated the Glatt WSG 120 at or near full capacity (200 lbs). At least ten agglomerations of 20% xanthan gum/80% carrier (Insta*Thick X-10)[9] were performed at IFP in 1983, prior to the filing of the application of the '938 patent.

Before August 1983, Sander and Cook co-authored "A Method for Improving the Rate of Polysaccharide Dispersibility/Dissolution Rates."[10] In that report, the inventors wrote:

> Three production runs (200 pound batches each), H3014041-03 (xanthan/maltodextrin M-100) are presented as evidence of reduction to commercial practice. Run data sheets show typical operating process parameters used; .... Two goals in these runs were 1) to establish optimum process conditions which would produce an acceptable product within a 30-minute run time, and 2) to establish product reproducibility from batch to batch.

(Ex. 16 to Merck's 12(m) Best Mode Statement, at 6.)

On August 17, 1983, Sander and Cook filed their patent application containing the following claim:

> A process for preparing an agglomerated particle having a vegetable gum component, the particle characterized by its quick dispersibility and dissolution into an aqueous solution, the process comprising: Agglomerating vegetable gum particles with a food grade particulate carrier to produce an agglomerated particle wherein the carrier and gum particles are bound to each other and the finished agglomerated particles having a moisture content below approximately 25% by weight of the agglomerated particle.

(Ex. 12 to Merck's 12(m) Best Mode Statement, at 1–2.)

8. The patent reads as follows:
   The residence time of the particles under the spray nozzle was approximately 35 seconds following each 35 second spray interval. ('938 patent, col. 4, lns. 41–43.)

9. Insta*Thick X-10 is the product resulting from the patented agglomeration process that combines maltodextrin and xanthan gum in the ratio of 4:1 by weight. (Zumbro's 12(n) Best Mode Response, ¶ 46.1.) The process of agglomerating Insta*Thick X-10 is described in Example 1 of the patent.

10. Merck has attached a copy of the document as Exhibit 16 to its Local Rule 12(m) Statement. Zumbro has not denied its authenticity, but neither party has identified the source of the document, the precise date it was written or published, or the circumstances or purpose for which it was prepared.

On October 25, 1984, the U.S. Patent and Trademark Office rejected the original application for the Sander/Cook patent on the ground that all the claims were unpatentable in view of the prior art. The examiner wrote:

> Purves et al and Gidlow disclose that fluidized bed agglomeration of sticky substances is old. To agglomerate gums such as the hydro colloids claimed as well as starches and proteins is also old as shown by Blondheim et al, Sienkiewicz et al, Reimers et al and Guckenberg [sic] et al.

(Ex. 10 to Merck's 12(m) Best Mode Statement, at 2.)

On March 11, 1985, Sander and Cook filed an amendment to the rejected claims, stating that "[a]s disclosed in the present application and as defined by the claims, gum particles of the present invention are agglomerated by intermittently drying and wetting in a fluidized bed condition created by a gaseous stream." (Ex. 12 to Merck's 12(m) Best Mode Statement, at 8.)

Thereafter, on December 10, 1985, the U.S. Patent and Trademark Office issued Patent No. 4,557,938 for Sander's and Cook's process. The '938 patent states that "the resultant agglomeration of vegetable gum and starch or equivalent particles surprisingly [sic] increases the rate of dispersion of the gum within an aqueous solution ..." ('938 patent, col. 2, lns. 24–28.) In the agglomerate produced by the process of the '938 patent, interstitial voids are left allowing entry by water for hydration with the gum. (Zumbro's 12(n) Best Mode Statement, ¶ 58.) The patent also describes the characteristics of the preferred agglomerated particles: the particles exhibited a size distribution such that 98 percent passed through a ten mesh sieve and not more than ten percent passed through a 200 mesh sieve. ('938 patent, col. 3, lns. 62–65.) The patent does state that, depending upon the end application, another particle size distribution could be used. Water constitutes less then ten percent by weight of the agglomerated particles after processing. (*Id.* col. 3, lns. 56–57.) The patent further sets forth viscosity development characteristics, testing procedures, and control comparisons. (*Id.* Examples 1–27.) Finally, the patent indicates that the suitable apparatus for achieving the process of the invention are fluid bed dryers, such as the Glatt WSG 120. (*Id.* col. 3, lns. 28–35.) According to Kenneth Olson, senior vice president of Glatt, the agglomeration process was merely a product application of something done "all the time." (Ex. O to Zumbro's 12(n) Best Mode Statement, ¶ 64.)

## B. Analysis of "Best Mode" Motion

### 1. *Standards for Proving Violations of Best Mode*

Defendant moves for summary judgment as to the invalidity of the '938 patent for its failure to disclose the "best mode" process of carrying out the claimed invention known to the inventors at the time they filed their application for the patent. Under 35 U.S.C. § 112, a patent application must "set forth the best mode contemplated by the inventor of carrying out his invention." [11] A patent applicant is expected to disclose information sufficient to enable another person skilled in the art to practice the best mode. *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.*, 927 F.2d 1200, 1209 (Fed. Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). The determination of whether or not a patent application adequately specifies the contemplated best mode is a question of fact. *Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 418 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 716 F.Supp. 316, 321 (N.D.Ill.1989), *aff'd,* 910 F.2d 804 (Fed.Cir.1990).

The purpose underlying the best mode requirement is to restrain inventors

11. Section 112 provides in part, as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112.

from applying for a patent while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived. *Wahl Instruments, Inc. v. Acvious, Inc.*, 950 F.2d 1575, 1579 (Fed.Cir.1991). The best mode requirement is thus aimed at ensuring that a patent applicant plays "fair and square" with the patent system. *Amgen, Inc.*, 927 F.2d at 1209–10. If the best mode contemplated by the inventor is not submitted in the patent application, the patent is invalid. *Dana Corp.*, 860 F.2d at 420.

The best mode inquiry involves two components. To prove failure to disclose the best mode, defendant must first show that the inventor contemplated a better mode than any other for practicing the invention at the time of filing of the patent application. This part of the analysis is subjective and examines whether the inventor must disclose any facts in addition to those sufficient for enablement (i.e., to enable one skilled in the art to make and utilize the invention). Only evidence of "concealment," whether accidental or intentional, is considered. Second, defendant must demonstrate that the inventor concealed that preferred mode from the public. This second part of the inquiry compares what the inventor knew with what he disclosed—in other words, is the disclosure adequate to enable one skilled in the art to practice the best mode? *Shearing v. Iolab Corp.*, 975 F.2d 1541, 1992 WL 220185, at *4 (Fed.Cir. Sept. 11, 1992); *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 926–28 (Fed.Cir.1990). Where a person skilled in the art "simply could not divine" the most advantageous way to use an invention, the best mode requirement is not met. *Id.* at 929. Defendant must prove that the patent applicant failed to comply with the "best mode" requirement by clear and convincing evidence. *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed.Cir.1991).

Patent law does not require the patentee to disclose specific data on how to mass-produce the invented product, nor to list the dimensions, tolerances, drawings, and other parameters of mass production not necessary to enable one skilled in the art to practice the invention. *Christianson v. Colt Indus. Operating Corp.*, 822 F.2d 1544 (Fed. Cir.1987), *vacated on other grounds*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). Noncompliance with the best mode requirement will be found only if the patent applicant has concealed, either knowingly or accidentally, "*his* or *her* preferred embodiment of the claimed invention." *Christianson v. Colt Industries Operating Corp.*, 870 F.2d 1292, 1301 (7th Cir.), *cert. denied*, 493 U.S. 822, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989). The patent applicant must disclose "the *best* mode of carrying out his claimed invention, not merely *a* mode of making and using what is claimed." *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 928 (Fed.Cir.1990).

### 2. *Analysis of the '938 Patent*

Merck argues that the '938 patent is invalid as a matter of law because it fails to describe the best mode process known to the inventors at the time they filed the patent application. Merck contends that the admissions of the inventors and experimental data demonstrate that there is no dispute of material fact regarding critical components of the patented process that were known and used by the inventors before they filed their application for the patent. When Sander and Cook filed their patent application, Merck contends, they knew of a mode of practicing their claimed invention that they considered to be better than any other. According to Merck, the inventors failed to set forth those known critical parameters in their patent specification, contrary to their legal obligation to do so.

In support of this argument, Merck points to the inventors' "process data" sheets, which contain contemporaneous records of the inventors' efforts to carry out the process of agglomerating gum with a particulate carrier. The inventors have testified about the entries on those data sheets, Merck notes, and have admitted that information which was critical to execution of the process does not appear in the patent and, further, that some of the information contained in the patent is wrong. Merck contends that the inventors' improvements to their process, as shown in the "process data" compiled prior to the filing date of the patent (but not dis-

closed in the '938 patent), constitute "indisputable evidence" of what was, at the time, the best mode of performing their invention. (Defendant's Motion and Supporting Memorandum for Summary Judgment of Invalidity under U.S.C. § 112 for Failure to Enable the Best Mode of Carrying Out the Invention ("Defendant's Best Mode Memorandum"), at 9.) Specifically, the "process data" sheets from the Insta*Thick X–10 agglomeration runs reveal, Merck insists, how the inventors developed additional conditions to optimize their process. Merck notes that these optimum process conditions used in the Insta*Thick X-runs are not sufficiently disclosed in the patent itself to enable one skilled in the art to use the invention.

Merck regards as particularly significant the inventors' improvements to their process, as reflected by the process data recorded at different times prior to the filing of the patent application. For instance, entries on process data sheet H132001 reflect settings and adjustments to the Glatt WSG 120 used in performing the process of the claimed invention on November 16, 1981.[12] Most of these settings and adjustments, however, were not disclosed in the patent itself. As noted by Merck, Sander indicated that these settings represented the best processing conditions that he knew in November 1981, and that any improvements to this process would be reflected in subsequent process data sheets. (*Id.* at 10.)

Merck contends that at least eight of the twelve critical operating parameters used by Cook and Sander to carry out their invention are not mentioned in the patent's claims. Merck identifies the following missing parameters: (1) the manufacturer, brand, particle size, and quantity of gum and particulate carrier used; (2) the amount, composition, and rate of application of the binder solution, atomizing air pressure; and (3) the settings for nozzle height and spray angle. Since these parameters are critical for one skilled in the art to achieve what Sander and Cook did, Merck urges that no genuine issue of material fact exists as to the conclusion that the patent is invalid for failing to meet the "best mode" requirement of 35 U.S.C. § 112.

In addition, Merck contends that subsequent process data reveals that Sander and Cook not only contemplated, but practiced, a better mode of carrying out their claimed invention than they disclosed in their patent. Merck quotes from a portion of a document written by Sander and Cook about their success at optimizing the agglomeration process between January and August in 1983. Although they could have incorporated their improvements into their application before filing it on August 17, 1983, Sander and Cook did not do so. The co-inventors wrote in 1983 that one of their objectives in performing three agglomeration runs on January 14, 1983 was to "establish optimum process conditions which would produce an acceptable product within a 30–minute run time." (Ex. 16 to Merck's 12(m) Best Mode Statement, at 6.) The process data sheets which have been produced demonstrate that by June 17, 1983 (two months before the filing of the application), Sander and Cook had in fact achieved reproducible full capacity (200 pounds per run) agglomerations of 20 percent xanthan gum and 80 percent particulate carrier in the WSG 120 within 30 minutes. (Ex. 11 to Merck's 12(m) Best Mode Statement.)[13] Be-

12. The process data sheet for Run H132001, which represented Sander's and Cook's first agglomeration of gum and particulate carrier, used 25 pounds of Keltrol (lot # KTL 50062K, Kelco's xanthan gum) and 100 pounds of "M–100," (lot # D1881, Grain Processing Corporation's maltodextrin particulate carrier), and utilized a "spray" of "pure water." (Ex. 8 to Merck's 12(m).) The nozzle height was set to 9½" above the bed. The spray cone of dispersion was adjusted by opening the air cap 2.25 turns. The pressure of the atomizing air supplied to the nozzle was adjusted to 4.25 atmospheres. The pump speed was set at 50 revolutions per minute. A spray interval of 25 seconds, interrupted by a shake interval of 3 seconds, was fixed. The inlet air temperature selector was set to 70 degrees Celsius. The fan was switched on to fluidize the particles. The inlet air damper was opened to 100 percent, while the outlet air damper was set at 35 percent. Then the pump was turned on to begin spraying. After 20 minutes, the pump speed was reduced to 35 RPM. The spray was stopped at 25 minutes. The particles were dried to 5.7 percent $H_20$. (Ex. 8 to Merck's 12(m) Best Mode Statement; Defendant's Best Mode Memorandum, at 10.)

13. According to the process data sheets for Runs H316809 (June 17, 1983) and H320305 (July 22, 1983), 160 pounds of Maltrin ("M–100") were agglomerated with 40 pounds of either "Rhodi-

cause these later run sheets reveal a more efficient process than that produced during the inventors' first agglomeration run in 1981, Merck argues that the inventors were required to disclose the particulars of that process in the August 1983 patent application.

According to Merck, the evidence demonstrates that the inventors "concealed" their preferred mode from the public. Merck asserts that the level of skill in the art in 1983 was such that the undisclosed operating conditions were critical to carrying out the best mode of the claimed invention (i.e., the process of intermittently wetting and drying gum and particulate carrier in a fluidized bed condition created by a gaseous stream). (Defendant's Best Mode Memorandum, at 12.) Merck observes that both Sander and Cook complained that the Glatt Manual did not explain the agglomeration process in sufficient detail to agglomerate satisfactorily. (Defendant's Best Mode Memorandum, at 13.) The Glatt Manual, in fact, directed specifically that the operator devise his own operating conditions to obtain optimum agglomeration: "To obtain the best results, one must find out the suitable way." (Ex. 7 to Merck's 12(m) Best Mode Statement, at 05-004.) According to Cook himself, the patent identified only four of the twelve operating parameters that he regarded as critical for carrying out the patented process; and one of these four disclosed parameters contained a significant error. *See supra* note 7 and accompanying text. Even Sander, with his considerable expertise in the art, acknowledged that agglomerating gum and particulate carrier in the Glatt WSG 120 was not a simple process: "There's a whole myriad of things that come in when you look at putting a product in a fluid-bed dryer. It ain't a piece of cake." (Ex. 4 to Merck's 12(m) Best Mode Statement, at 247, ln. 5-7.)

As further support for its contention that the patent failed to enable a person skilled in the art to carry out the best mode of the patented process, Merck argues that Example 1 (which contains the sole disclosure of any mode of performing the process claimed in the process) is inoperable. In an exchange between Cook and Merck's attorney, Cook admitted that Example 1, as set forth in the patent, fails to enable the production of dispersible particles:

Q: What does that mean, the residence time of the particles under the spray nozzle was approximately 35 seconds following each 35 second spray interval? [Cook Dep., at 150, ln. 9.]

. . .

A: I think the only way that could be done is if the fluid bed was stagnant.

. . .

Q: You'd have bowling balls moving around in there.

A: That's correct. [*Id.* at 152, lns. 10-16.]

. . .

Q: So that phrase is incorrect, isn't it, since you weren't making bowling balls?

A: It appears to be incorrect to me, yes. [*Id.* at 153, lns. 2-4.]

(Cook Dep., Ex. 5 to Merck's 12(m) Best Mode Statement.) While Merck admits that one skilled in the art could calculate some of the undisclosed parameters, Merck contends that "no one, other than by luck, would be able to duplicate" the inventors' results from their disclosure. (Defendant's Best Mode Memorandum, at 15.)

### a. *Failure to Disclose Operating Parameters of the Glatt WSG 120*

Zumbro admits that the '938 patent does not disclose certain parameters used in the

gel 23" or "Meerzan 8" xanthan gum. Both runs used 30 pounds of pure water as the spray solution. As in Run H132001 (*see supra* note 12), for these runs the nozzle height was set at 9½", and the angle of dispersion fixed at 2.25 turns. The atomized air pressure was again set at 4.25 atmospheres. Also, the inlet air damper was opened to 100 percent, and the outlet damper was closed to 35-50 percent. And again, the spray interval of 25 seconds was interrupted by a filter shake interval of 3 seconds. Unlike the earlier Run H132001, however, the pump speed for these two runs was set between 60 and 80 revolutions per minute on a peristaltic pump, and the fluidization air temperature was set at 85-92 degrees Celsius. (Ex. 11 to Merck's 12(m) Best Mode Statement.)

operation of the Glatt WSG 120 machine, but argues that such parameters are extrinsic to Sander's conception of his invention. (Plaintiff's Response to Merck's Motion for Summary Judgment of Invalidity for Failure to Disclose the Best Mode ("Plaintiff's Best Mode Response"), at 8.) Zumbro contends that the inventors did not direct any claims in their patent application toward the optimization of operating a Glatt WSG 120 machine or any other fluid bed dryer, the agglomeration of preliminary blend of 20% xanthan gum and 80% maltodextrin, completion of the process in under 30 minutes, or reproduction of the product. *Id.* Zumbro argues that the claimed invention is precisely what the patent describes: a process that results in "intermittently drying and wetting in a fluidized bed condition created by a gaseous stream." *Id.* at 9. The specification teaches this process, Zumbro contends, rather than "a process particular to the Glatt WSG 120, as asserted by Defendant." *Id.*

Thus, Zumbro's principal contention in opposition to Merck's motion is that the patentee's "best mode" obligation does not extend to requiring that Sander and Cook identify in their patent the make, size, and operating parameters of the fluid bed dryer. In support, Zumbro relies upon *Mendenhall v. Astec Indus. Inc.,* 14 U.S.P.Q.2d 1134, 1140, 1988 WL 193214 (E.D.Tenn.1988), *aff'd,* 891 F.2d 299, 891 F.2d 299 (Fed.Cir.1989). In *Mendenhall,* the court found no best mode violation where the patent failed to disclose the particular computer and computer program used in the commercial embodiment of a patent for the method of weighing and dispensing material from a surge bin of an asphalt plant. The court found no evidence that disclosure of the patent would not enable one conversant with programming microprocessors to develop a similar system to perform the steps of the patent. The court considered as "significant that it is not [the computer manufacturer's] hardware or software that is protected in the weighing patent but simply the method of weighing and dispensing material from a surge bin...." 14 U.S.P.Q.2d at 1140. Finally, the court noted that the computer circuitry required to practice the invention was well within the skill of the art at the time of the invention. *Id.*

Zumbro suggests that requiring the inventors here to set forth all of the operating parameters they developed for agglomerating a particular blend of gum and maltodextrin in a particular brand of machine would be equivalent to requiring the patentee in *Mendenhall* to have set forth his computer program in full. Zumbro insists that the steps to be taken with any fluid bed dryer were within the skill of one versed in the art. Accordingly, Zumbro argues, the patentees had no obligation to "provide a tutorial" concerning the Glatt WSG 120 machine. (Plaintiff's Best Mode Response, at 10.)

The facts of *Mendenhall* are distinguishable from the circumstances presented here, however. Computer programs need not always be disclosed to fulfill the best mode requirement; if the patent furnishes the information necessary to write such programs, "there would seem to be no cogent reason to require disclosure of the menial tools known to all who practice this art." *See In re Sherwood,* 613 F.2d 809, 817 n. 6 (C.C.P.A.1980) ("[T]he conversion of a complete thought (as expressed in English and mathematics, i.e., the known input, the desired output, the mathematical expressions needed and the methods of using those expressions) into the language a machine understands is necessarily a mere clerical function to a skilled programmer."), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). Zumbro has presented no evidence, however, that the operating parameters of the Glatt WSG 120 fluid bed dryer constitute clerical functions or obvious, mere menial tools to one seeking to duplicate the patented agglomeration process. To the contrary, Zumbro's own witness has testified that the operating parameters were "critical"; and unrebutted evidence demonstrates that determining the optimum parameters was a goal of Sander's and Cook's efforts prior to August 1983. Zumbro has presented no evidence to support a conclusion that these optimum parameters were well known to one skilled in the relevant art.

Plaintiff has also cited *Christianson v. Colt Indus. Operating Corp.,* 822 F.2d 1544 (Fed. Cir.1987), *vacated on other grounds,* 486 U.S.

800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), for the proposition that the scope of the "best mode" requirement encompasses only the claimed invention at the time of the filing of the patent application. Although Plaintiff cites to the Federal Circuit opinion, the "best mode" discussion was revisited in a later decision by the Seventh Circuit. 870 F.2d 1292 (7th Cir.1989), *cert. denied,* 493 U.S. 822, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989). Following a circuitous dispute concerning which court properly had jurisdiction over the case, the Seventh Circuit eventually considered the question of whether patents on rifle parts violated the best mode requirement by failing to disclose specifications and tolerances necessary to make parts interchangeable with M–16 rifles already in existence. The *Christianson* court observed that the scope of the patents extended to improvements in parts used in any rifle, not specifically M–16s. *Id.* at 1301–03. Because the best mode for making and carrying out the claimed inventions did not involve either the M–16 rifle or interchangeability with M–16s, the Seventh Circuit reversed the district court's grant of summary judgment for plaintiffs. Instead, the court found that summary judgment should be entered declaring that defendant rifle manufacturer had disclosed the best mode of carrying out its inventions. 870 F.2d at 1302–03.

*Christianson* is distinguishable from the circumstances here as well. Even though the '938 patent does not explicitly mention all of the "critical parameters" described by Defendant for the agglomeration process, Inventor Cook explicitly acknowledged that such undisclosed parameters were part of his invention. The settings and adjustments recorded on the process data sheets of runs subsequent to H132001, in fact, underscore the parameters that Sander and Cook actually deemed critical in carrying out the process of their invention.

*Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524 (Fed.Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987), a case cited by Defendant, presents circumstances more analogous to those here. In *Spectra–Physics,* the Federal Circuit considered whether a patent directed to a method of fabricating an ion laser was invalid for failure to disclose the best mode, based on a complete lack of detail about a six-stage braze cycle [14] necessary to the enjoyment of the invention taught by the patent. The court held that the laser patent violated the best mode requirement, even though the patent disclosed the inventor's preferred brazing compound (TiCuSil—an copper silver eutectic) and his preferred securing process (brazing). Although the patent discussed brazing in general, the court observed that the patent disclosed neither the actual brazing cycle with TiCuSil nor any of the parameters which the patent holder found to be its best mode. *Id.* at 1537.

> [The patent holder] admits that its [process] is not disclosed in [its] patent nor is it contained in the prior art. Instead, it maintains that its [process] is unique to its [processing equipment], and because the performance of [such equipment] varies considerably, the actual parameters would be meaningless to someone who used a different [brand of equipment].

*Id.* at 1536. The court was not persuaded by this argument, one nearly identical to Zumbro's. In *Spectra–Physics,* the court concluded that the patent's complete lack of detail about the brazing process "effectively resulted in [the patent holder's] concealment." *Id.* at 1537. *See also Deep Welding, Inc. v. Sciaky Bros., Inc.,* 417 F.2d 1227, 1241 (7th Cir.1969) (process patents in "crowded" areas of prior art must have a preciseness of description; language of the patent must tell the operator of a machine who desires to perform the process exactly how to proceed so as to perform successfully), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648 (1970); *Pennsylvania Crusher Co. v. Bethlehem Steel Co.,* 193 F.2d 445, 448–49 (3d Cir.1951) (claim in process patent must include all necessary occurrences in the process; size range of material and length of

14. "Braze cycle," a term of art, refers to a process defined by specific parameters of temperature, duration at given temperatures, pressure, and atmosphere. *Spectra–Physics,* 827 F.2d at 1530. The patent claimed a method of attaching copper cups to a ceramic tube for use in a laser through brazing.

hammers must be disclosed in order for hammermill operator to know when he has attained substantial penetration of particles falling into that part of a hammer cylinder traversed by hammers). Similarly, Cook's and Sander's limited disclosure of the Glatt WSG 120 operating parameters can also be deemed to result in unlawful concealment.

*Wahl Instruments, Inc. v. Acvious, Inc.*, 950 F.2d 1575 (Fed.Cir.1991), a case which was decided after the parties' briefing here, also involved a dispute over the best mode of carrying out an invention in a motion for summary judgment. The *Wahl* court instructed that a patent need not describe all facets of the manufacturing process in order to satisfy the best mode requirement. To determine whether that requirement has been met, the court cannot apply a "mechanical rule" but must consider "the scope of the invention, the skill in the art, the evidence as to the inventor's belief, and all of the circumstances...." *Id.* at 1580.

The patent in *Wahl* concerned an egg-timer made out of thermochromic and temperature indicating materials. *Id.* at 1577. The patent specification stated that the device may be ultrasonically welded or joined by adhesive or by " 'any other suitable or desirable means for [bonding the materials].' " *Id.* at 1580 (quoting the language of the patent). In manufacturing the device, the inventor used an embedment molding technique which was not described in the patent. Plaintiff's former employee began a business making a competitive egg-timer. In a lawsuit charging the former employee with infringement, the court granted summary judgment on the ground that the patent's failure to disclose the specific embedment molding method for manufacturing the product violated the best mode requirement. In reversing that determination, the Federal Court observed that a description of the particular technique selected to manufacture a device may or may not be needed to comply with the best mode requirement. *Id.* at 1579. The *Wahl* court stated:

> [T]he particulars of making a prototype or even a commercial embodiment do not necessarily equate with the "best mode" of "carrying out" an invention. Indeed, the inventor's manufacturing materials or sources or techniques may vary from wholly irrelevant to critical. For example, if the inventor develops or knows of a particular method of making which substantially improves the operation or effectiveness of his invention, failure to disclose such peripheral development may well lead to invalidation. On the other hand, an inventor is not required to supply "production" specifications.

*Id.* at 1579–80 (citations omitted). Finding that the information missing from the patent application (e.g., the embedment molding) "was no more than a routine manufacturing choice," the circuit court found that the grant of summary judgment was improper. *Id.* at 1580.

The court's holding in *Wahl* is instructive because it, too, involves both a process patent and an infringer which raises the best mode defense in a motion for summary judgment. Unlike the facts here, however, the patentee in *Wahl* could point to testimony by the inventor demonstrating his own uncertainty at the time of filing of the patent application as to the best method. Cook, by contrast, has admitted that certain critical parameters that he did know were missing from the patent specifications. Another distinction between *Wahl* and the present case is the significance of the information omitted from the patent specifications: the *Wahl* court regarded the missing embedment information as "no more than a routine manufacturing choice"; here, by contrast, Cook himself has acknowledged the eight parameters absent from the patent as "critical." Sander and Cook both wrote in 1983 that one of the objectives of their three agglomeration runs was to find optimal process conditions. Zumbro has not effectively challenged Merck's contention that, having identified those optimal conditions, Sanders and Cook were required to reveal them.

**b. *Whether Zumbro Has Shown a Genuine Dispute of Material Fact***

A party seeking a summary judgment of invalidity bears a heavy initial burden, because an issued patent carries a statutory presumption of validity under 35 U.S.C.

§ 282. *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1036 (Fed.Cir.1987). To overcome that burden, courts have required the movant to establish the invalidity through clear and convincing evidence. *Id.* Once a sufficiently supported motion for summary judgment has been submitted, however, the burden of coming forward and showing that there is a genuine dispute of a material fact shifts to the non-moving party. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1571 (Fed.Cir.), *reh'g denied*, (1991). In order to meet such burden, the non-moving party must present " 'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The need to inquire into the inventor's state of mind, however, should "not per se preclude the granting of summary judgment on the best mode issue where there are no disputed issues of fact." *Acme Resin Corp. v. Ashland Oil, Inc.*, 20 U.S.P.Q.2d 1305, 1310, 1991 WL 274498 (S.D.Ohio 1991) (granting summary judgment where patent applicant failed to disclose preferred binder components in process for making foundry cores and molds for casting of metal), *aff'd*, 954 F.2d 735, *cert. denied*, — U.S. —, 113 S.Ct. 189, 121 L.Ed.2d 133 (U.S.1992). " 'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.' " *Scripps Clinic*, 927 F.2d at 1571 (citations omitted).

Merck has demonstrated that inventors Cook and Sander omitted critical process parameters from the patent specification. In particular, the testimony of Cook acknowledging that the undisclosed process conditions constituted part of the invention is especially damaging to Plaintiff; Zumbro has made no effort to explain why this admission should be disregarded. Nor has Zumbro submitted any explanation for the written statements of Sander and Cook, made prior to the filing of the patent application in 1983, that they hoped "to establish optimal process conditions" in three agglomeration runs. Finally, Zumbro has not countered the evidence that its process data sheets show that Sander and Cook had, by the filing date, employed the parameters acknowledged by Cook to be critical in agglomerating xanthan gum with a particulate carrier in the Glatt WSG 120; yet these parameters are not set forth in the patent.

This evidence demonstrates that the patent specifications concerning the operating instructions for the Glatt WSG 120 during the agglomeration process were inadequate to comply with best mode requirements. The Glatt Manual itself states that one must seek out the "most suitable way" in order to obtain best results. The very lack of instructional guidance for operating the Glatt WSG 120 tends to show that without identification of specific parameters, the patented agglomeration process cannot be performed without undue experimentation from known materials. *See Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.*, 927 F.2d 1200, 1211 (Fed.Cir.) (lack of sample of biological cells does not constitute failure to comply with best mode requirement if cells can be prepared without undue experimentation from known materials, based on patent description), *cert. denied*, — U.S. —, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

Zumbro "has set forth no facts to exhibit a dispute about whether the ... best mode requirements, properly understood, were fulfilled by [Sander's and Cook's] patent[ ]." *Christianson*, 870 F.2d at 1303. Although Zumbro has intimated that one "skilled in the art" would be familiar with the specific critical parameters, it has offered no evidence that this is so. Similarly, Zumbro asserts that it need not set forth operating parameters because the patent application did not direct any claims to optimizing operation of a Glatt WSG 120 machine, or any other fluid bed dryer; yet Zumbro has not submitted any affidavits or other materials to suggest that such a machine was not indispensable to successful execution of the patented process. Indeed, Zumbro has presented no evidence that the experiment could have been performed successfully using another brand of dryer. Zumbro suggests that successful agglomeration can be achieved through trial and error; yet Zumbro provides no affidavits showing that an individual skilled in the op-

eration of fluid bed dryers could determine the optimal operating parameters without excessive experimentation. Finally, Zumbro has remained silent on the question of why Sander's adjustments to the process subsequent to the H132001 run do not appear anywhere in the patent.

The court can conceive of numerous potential disputes not addressed by either party.[15] The court is sensitive to these potential issues; it is sensitive as well, however, to its proper role here: to determine whether Defendant has demonstrated the absence of any disputes of *material* fact regarding the "best mode" requirement. In *Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 420 (Fed.Cir. 1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989), the Federal Circuit found a violation of the best mode requirement where a valve stem seal patent failed to disclose an unclaimed fluoride surface treatment that was necessary for satisfactory performance. The court observed that the applicant's own letter and testimony concerning the applicant's first sales of seals presented uncontroverted and corroborating evidence that at the time of filing, the inventor believed that the best method of carrying out his invention included fluoride treating surface of seals with fluoride. "Having no evidence to the contrary to consider, reasonable minds could not have differed as to whether [the inventor] believed that [an undisclosed step in carrying out the patent] was part of the best mode of carrying out the claimed invention." *Id.* at 420.

Similarly, here, Zumbro has failed to provide evidence to dispute whether Cook and Sander believed the critical parameters absent from the patent constituted part of the best mode. Because there are no genuine issues of material fact remaining on the issue of best mode, summary judgment should be entered for Merck.

### *Recommendation*

Defendant's motion for summary judgment of invalidity based on Plaintiff's failure to comply with the "best mode" requirement should be granted.

## *MERCK'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF VIOLATION OF "ON SALE" BAR OF 35 U.S.C. § 102(b)*

At issue in Defendant's motion for summary judgment is whether inventor Sander commercially exploited the method[16] of the '938 patent prior to the statutory one-year grace period (the "critical date"), in violation of the "on sale" bar of 35 U.S.C. § 102(b).

### A. Facts Relating to "On Sale" Motion

Zumbro filed its patent on August 17, 1983 with the United States Patent and Trademark Office. Under 35 U.S.C. § 102(b),[17] the inventor of a patented product or process is prohibited from commercial exploitation of the invention more than one year before the filing of the patent application. An inventor who violates this prohibition renders the invention ineligible for a patent. The purpose of this prohibition against prior sales by the patentee—referred to as the "on-sale" bar—is to encourage dis-

**15.** Neither party has discussed the significance of the scope or range of possible adjustments (i.e., with regard to nozzle height, pump speed) on the Glatt machine; for example, is a nozzle height setting of 9½" standard for operational use? Or might settings of 8½" or 5½" be used with equal frequency and effectiveness? Nor has either party adequately briefed the issue of the significance of the error in Example 1 of the '938 patent concerning the residence time of the particles under the spray nozzle; in other words, what is the significance of an error in a patent application for purposes of best mode?

**16.** Where a method is the subject of a patent, the "on sale" prohibition of 35 U.S.C. § 102(b) has been interpreted to mean that the sale of a product produced by the method of the invention before the critical date results in forfeiture of the patent on the method. *D.L Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1147 (Fed.Cir. 1983). The statute precludes attempts by the inventor to profit from the commercial use prior to the critical date of the invention, whether that invention is a product or a method. *Id.*

**17.** 35 U.S.C. § 102 provides in pertinent part:

> A person shall be entitled to a patent unless....
>
> (b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States....

closure of inventions by preventing the inventor from extending his or her period of protected patent monopoly longer than the one-year statutory "grace period."[18] The critical date here for "on sale" activity relating to the '938 patent is one year before the filing of the application for the subject invention—thus August 17, 1982.

In this motion, Merck contends that the method was commercially exploited prior to the "critical date" and that Zumbro is therefore barred from enforcing its patent. Merck identifies two sets of circumstances as events that constitute placing the method "on sale" in violation of § 102(b). The facts involved are set out separately below.

1. ***Run No. H132001***

Sander and Cook first reduced their invented method to practice with the fluid bed dryer run, referred to here as "Run No. H132001," on November 16, 1981. Prior to that date, on June 30, 1981, Kelco had shipped twenty-five pounds of xanthan gum to Sander at the Grain Processing Corporation. On November 16, 1981, using the method, twenty-five pounds of xanthan gum (a vegetable gum), and 100 pounds of maltodextrin 100 (a food grade particulate carrier), were agglomerated to form 125 pounds of agglomerated xanthan gum and maltodextrin. At his deposition, Sander was asked whether Run No. H132001, as performed on November 16, 1981, reflected a method that employed each specific step of Claim 15 of the '938 patent. When questioned specifically about each individual step, Sander responded affirmatively.

Sander also admitted that at that time Kelco was a targeted customer. He stated that he "was trying to" sell to Kelco when he reduced his invention to practice and that he "wanted to sell Kelco at that time." Sander was asked, "You wanted to have Kelco become a customer for your custom processing, correct?" Sander responded, "That's right." (Ex. U to Merck's 12(m) On Sale Statement, at 158, ln. 12–18.)

Zumbro has admitted that IFP sent samples of agglomerated maltodextrin to customers to interest them in utilizing IFP as a custom processor, although the record does not establish when this occurred. (Zumbro's 12(n) On Sale Statement, ¶ 44.) Sander states that he provided Kelco with the product produced by the method of his invention so that Kelco could "look at" it. Sander recalled his dealings with Kelco as an effort to convey this information: "We made the invention happen. We said, hey, look at this. It works." It is undisputed that Sander or IFP sent Kelco the batch, known as Run No. H132001, or most of the batch, or a sample of it, in an effort to interest Kelco in IFP's custom processing. A Kelco laboratory notebook issued to Howard Wright, Jr. (apparently a staff scientist at Kelco) indicates that on January 22, 1982, Kelco evaluated a sample of IFP's product known as Run No. H132001. Zumbro's counsel stipulated that the reference to Run No. H132001 in Wright's notebook, was "Zumbro [IFP] material" and that "that batch was sent out [by IFP] to Kelco."

In response to Merck's 12(m) On Sale Statement, Plaintiff has offered this additional information: From 1981 through 1985, Frank A. Wilcox, Jr. was Kelco's sales representative to IFP/Zumbro. Wilcox visited the IFP/Zumbro facility and acquired samples of Sander's new agglomerated product. During the course of his relationship with IFP, Wilcox entered into a confidentiality agreement with IFP. (*Id.* ¶¶ 58–60.) Plaintiff notes, as well, that the record contains no price quotations or formal written documentation of any offer to Kelco of agglomerated material produced by IFP in accordance with the claims of the '938 patent prior to the critical date of the patent. (*Id.* ¶ 56.)

18. The Federal Circuit has identified at least four policies underlying the on sale provision:

> These policies include discouraging removal of inventions from the public domain that the public reasonably has come to believe are freely available; favoring the prompt and widespread disclosure of inventions; allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and prohibiting the inventor from commercially exploiting his invention beyond the statutorily prescribed time.

*Envirotech Corp. v. Westech Engineering Inc.*, 904 F.2d 1571, 1574 (Fed.Cir.), *reh'g denied* (1990).

### 2. *The Unifiber Product*

As a second instance in which a product produced by the method was placed "on sale" prior to the critical date, Merck refers to a production run in late July 1982. The IFP run sheets of July 19, 1982, July 24, 1982, and July 27, 1982 list the product as "UNIFIBER" and bear the name "I.F.P., Incorporated Agglomeration Dept." at the top of each sheet. The IFP "Agglomeration Log" for 1982 documents that the following poundage of Unifiber product was made on the following dates: June 7 (150 pounds), June 8 (150 pounds), July 19 (150 pounds), July 24 (350 pounds), July 27 (900 pounds), July 28 (2,418 pounds), and July 29 (2,225 pounds). The total poundage of Unifiber produced by IFP from July 27, 1982 through July 29, 1982 thus weighed 5,543 pounds.

IFP Invoice No. 822154, which is dated August 3, 1982 (fourteen days prior to the August 17, 1982 critical date), reflects that "855 lbs." and "4,600 lbs." (i.e., a total of 5,455 lbs.) of Unifiber were sold to Numed Corporation for $2,178.00 and shipped to Advance Packaging Corporation. A handwritten notation encircled on the invoice indicates "Paid Rec'd 8/18." IFP's invoice ledger for 1982 shows that 5,455 pounds of Unifiber were shipped on August 3, 1982, references invoice No. 822154 in the amount of $2,178.00, and reflects payment of the invoice amount on August 18, 1982.

At his deposition, Sander was questioned as to whether the method used to prepare the Unifiber product on the first run (Run No. H220801) of July 27, 1982 employed each step of Claim 1 of the '938 patent. He responded in the affirmative for each step. (Merck's 12(m) On Sale Statement, ¶¶ 27 and 27A.) In its Rule 12(n) statement and memorandum in response to Merck's motion for summary judgment, however, Zumbro disputes that IFP Run No. H220801 was a product of the patented method. Specifically, Zumbro contends that maltodextrin was not dry blended with xanthan gum, as directed in the claims of the '938 patent. Instead, according to Zumbro, a binding solution of heated, dissolved maltodextrin in water was sprayed on the Solka–Floc (i.e., nonsoluable cellulose) and xanthan gum/gum blend during fluidization. Thus, argues Zumbro, Solka–Floc did not function as a carrier with respect to gum in the agglomerated particle. (Zumbro's 12(n) On Sale Statement, ¶¶ 27, 27A, 47–52.) Further, according to Zumbro, the resulting Unifiber particle was nonsoluble and thus failed to exhibit the physical characteristics of solubility required by Claim 15. (*Id.* ¶¶ 28, 28A, 54–55.)

As he had testified with regard to Claim 1 of the '938 patent, however, Sander responded affirmatively to inquiries about whether the methods used in preparing the Unifiber product on Run No. H220801 employed each step of Claim 15. (Merck's 12(m) On Sale Statement, ¶¶ 28 and 28A.)

## B. Analysis of "On Sale" Motion

### 1. *Standards for Proof of "On Sale" Activity*

Defendant Merck, which challenges the validity of the '938 patent, bears the burden of proving an instance of use or sale of the patented invention prior to the critical date. *See Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,* 970 F.2d 834, 836 (Fed.Cir.), *reh'g denied,* 974 F.2d 1279 (1992); *Dart Indus., Inc. v. E.I. duPont de Nemours & Co.,* 489 F.2d 1359, 1364 (7th Cir.1973), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974). Proof of such use must be by "clear and convincing evidence." *Atlantic Thermoplastics Co., Inc.,* 970 F.2d at 836. The "clear and convincing" standard of proof required to attack a patent is an intermediate standard which lies somewhere between beyond a reasonable doubt and a preponderance of the evidence. *Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988). A single sale alone is sufficient to invalidate a patent under § 102(b). *Atlantic Thermoplastics Co., Inc.,* 970 F.2d at 836.

After the party attacking the patent presents such evidence of an instance of use or sale before the critical date, however, the burden shifts to the patent holder to establish that the activity was secret or experimental, thus falling within an exception to the statutory bar provisions. *United States Environmental Products Inc. v. Westall,* 911

F.2d 713, 716 (Fed.Cir.1990) ("Once a defendant demonstrates a prima facie case of on-sale or public use, the patent holder must 'come forward with convincing evidence to counter that showing.'" (citation omitted)); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir.1983) ("To defeat a motion for summary judgment, a patentee need not prove an experimental purpose but must submit facts indicating an ability to come forward with evidence that such proof is possible."), *cert. denied*, 474 U.S. 825, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985).

### 2. *Analysis of Defendant's Claim that Sander and Cook Violated the "On Sale" Bar of 35 U.S.C. § 102(b)*

Plaintiff filed its '938 patent application on August 17, 1983; accordingly, the critical date for its patent is August 17, 1982. Although only one "on sale" event is sufficient to invalidate the patent, Defendant contends that the undisputed evidence shows that Plaintiff forfeited its right to the '938 patent by engaging in at least two "on sale" events: (1) selling 5,484 pounds of Unifiber product to Numed on August 3, 1982 for $2,178.00, and (2) offering, no later than January 22, 1982, to custom process for Merck's Kelco division a sample of the product that had been produced by Plaintiff's method of invention. Defendant observes that what was "on sale" was not the product, but rather Zumbro's "custom processing" service. (Defendant Merck's Motion and Memorandum for Summary Judgment of Invalidity Based Upon the Commercial Exploitation of the '938 Patent Prior to Its Critical Date, at 11.)

The question of whether a patented invention has been placed "on sale" for more than a year prior to the application for the patent must be decided on the facts of each case. The court considers "the totality of the circumstances relating to the character and extent of commercial activities, the type of invention and its stage of development as evidenced by engineering models, prototypes, and production models, along with the character and extent of bona fide experimentation." *Western Marine Elec., Inc. v. Furano Elec. Co., Ltd.*, 764 F.2d 840, 845 (Fed.Cir. 1985); *Philco Corp. v. Admiral Corp.*, 199 F.Supp. 797, 817 (D.Del.1961) (acknowledging as a key factor the intent of the patentee or inventor rather than that of the prospective buyer). Other factors to be considered include the length of the test period, the number of tests performed, the duration of the testing period relative to testing periods of similar inventions, whether any payment has been made for the invention, whether the user is bound to any secrecy obligation, whether progress records are maintained, and whether persons other than the inventor conducted the various experiments. *In re Brigance*, 792 F.2d 1103, 1108 (Fed.Cir.1986).

An invention may be placed "on sale" in two ways. First, it may be placed "on sale" by an actual and completed transaction. Alternatively, an invention may be placed "on sale" whenever its inventor engages in any activity to sell the patented idea, including making an offer for sale. *Amphenol Corp. v. General Time Corp.*, 397 F.2d 431, 433 (7th Cir.1968). In *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859, 869 (D.Del.1972), a frequently-cited decision, the court observed that an invention offered for sale before the statutory cut-off date is on sale within the meaning of § 102(b) even though no actual sale has occurred:

> This is true even when (a) but one offer has been made to but one customer; (b) the prices are only estimated rather than established; (c) no commercial production runs have been made; and (d) the alleged invention is never sold.

*Id.* at 869. *See also Wende v. Horine*, 225 F. 501, 505 (7th Cir.1915) ("[A]n offer to sell, made to a prospective purchaser after the experimental stage has been passed, the invention reduced to practice, and the apparatus manufactured in its perfected form, is a placing on sale within the statute.").

The "on sale" rule does allow an exception for a sale or offer that was experimental. A patent owner may avoid the on-sale bar by showing that the sale represented a "bona fide effort to perfect the invention or to ascertain whether it will answer its intend-

ed purpose." *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1071 (Fed.Cir.) (citation omitted), *reh'g denied* (1992). To rely on this exception, the patent owner must have sought the sale as part of a testing program rather than primarily for profit or commercial exploitation. *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,* 970 F.2d 834, 836–37 (Fed.Cir.), *reh'g denied,* 974 F.2d 1279 (1992). Thus the experimental use exception does not include market testing where the inventor seeks to gauge consumer demand for his invention. *In re Smith,* 714 F.2d 1127, 1135 (Fed.Cir. 1983).

a. ***Did IFP Offer Its Custom Processing for Sale by Providing Kelco with a Sample of the Product of Run No. H132001?***

Merck argues that a sample of Run No. H132001 was offered to Kelco for evaluation almost seven months prior to the critical date. According to Merck, the product of Run No. H132001 was prepared on November 16, 1981 pursuant to the method of the '938 patent. Merck notes that Sander, in his deposition, admitted that he personally "was trying to" sell to Kelco at that time. (Ex. U to Merck's 12(m) On Sale Statement, at 161, ln. 19.) Merck then points out that an entry in a Kelco laboratory notebook shows that on January 22, 1982, Kelco evaluated a sample of an agglomerated xanthan gum product labelled "H132001." (Ex. J to Merck's 12(m) On Sale Statement, at 104425.) Thus, a sample of H132001 was offered for sale, "via evaluation," according to Merck, to Kelco more than one year prior to the critical date. (Defendant's On Sale Memorandum, at 11.)

Plaintiff denies that any offer or sale to Kelco occurred. Plaintiff contends that Defendant's arguments rest on nothing more than (1) Kelco's access to a sample of product produced in accordance with the invention, and (2) Sander's hope that Kelco would become a customer of IFP custom processing. Citing *UMC Electronics. Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), Plaintiff argues that Defendant has not met its burden of proving that there was a "*definite* sale or offer to sell" more than one year before the application for the patent. Plaintiff points out that Defendant has not supplied any witnesses verifying that an offer was made or any memoranda indicating prices of a purported offer. Finally, Plaintiff justifies (without citation to any material in the record) Kelco's acquisition of samples from Sander's invention on the basis that Frank Wilcox, Kelco's sales representative and a friend of Sander, "had every incentive to promise the assistance of Kelco's customer support services to help a customer launch a new project." (Zumbro's Response to Merck's Motion for Summary Judgment of Invalidity Based upon Commercial Exploitation of the '938 Invention prior to Its Critical Date ("Zumbro's On Sale Response"), at 8.)

In reply, Defendant responds that Plaintiff failed to furnish any affidavits or specific facts raising a genuine issue for trial. (Merck's Reply to Zumbro's Response to Merck's Motion for Summary Judgment of Invalidity Based upon Commercial Exploitation of the '938 Invention prior to Its Critical Date ("Merck's On Sale Reply"), at 12.) Defendant further points out that, even if Zumbro did supply sufficient written documentation, Zumbro cannot challenge the evidence offered by Merck that Sander himself admitted that an offer to sell took place. (*Id.* at 13.) Defendant refers to ¶ 43 of its 12(m) On Sale Statement, which Zumbro does not dispute, including quoted portions of Sander's deposition:

> Sander or IFP sent Kelco the batch, known as Run No. H132001, or most of the batch or a sample of it in an effort to interest Kelco in IFP's custom processing:
>
> Q: Let's go back. You were trying to sell a product to Kelco?
>
> A: Not a product.
>
> Q: *You were trying to sell the service?*
>
> A. *Correct.*

Defendant also argues that Sander admitted that IFP's custom processing services were for "money or profit":

Q: Again let me get the economics of this. You expected to make money or profit off of custom processing, correct?
A: That's correct.
Q: That's the business you were in.
A: Exactly.

(Sander Dep. at 163, Ins. 6–11, Ex. U to Merck's 12(m) On Sale Statement.)

Such admissions, however, fall short of satisfying the "definite offer to sell" requirement of the "on-sale" bar. "The requirement of a *definite* offer excludes merely indefinite or nebulous discussion about a possible sale." *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1062 (Fed.Cir.1989). While this requirement may be satisfied by activities that fall short of an "offer" under contract law, "a definite offer in the contract sense clearly meets this requirement." *Id.* Merck, however, has not presented evidence of any commercial arrangement between Kelco and Sander beyond Sander's supplying Kelco with a sample product for purposes of "evaluation."

The parties here do not address the issue of whether the "on sale" bar of § 102(b) is violated by an inventor's distribution of samples to a potential customer, prior to the critical date, for the purpose of generating sales. This court's own research demonstrates a lack of consensus on this question. *Compare Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir.) ("Even free distribution of a prototype may raise the on-sale bar if it is done to solicit a sale."), *reh'g denied* (1991); *Kalvar Corp. v. Xidex Corp.*, 556 F.2d 966 (9th Cir.1977) (distribution of samples, in order to generate commercial activity and solicit sales, is sufficient to support a finding of "on sale" under § 102(b)); *and Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1566–1569 (Fed. Cir.1984) (sample injection syringe sent to physician for purpose of inducing purchase held to be "on sale"); *with Baker-Cammack Hosiery Mills, Inc. v. Davis Co.*, 181 F.2d 550, 558 (4th Cir.) (commercial sample of hosiery embodying a patented invention, sent to sales broker with accompanying invoice, did not constitute prior sale sufficient to invalidate the patent where no sales were made to public or anyone except broker), *cert. denied*, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605 (1950); *Huntington Dry-Pulverizer Co. v. Newell Universal Mill Co.*, 109 F. 269, 271 (C.C.N.Y.1901) (invention not "on sale" where it proved unsuccessful and was abandoned, even though it was to be paid for if successful); *and William B. Mershon & Co. v. Bay City Box & Lumber Co.*, 189 F. 741, 748 (C.C.Mich.1910) (shipment of machine under a "sale or return" contract by express agreement "to let you test it" was not on sale until accepted by purchaser).

One factor that courts often consider in applying the "on sale" bar to the pre-critical date distribution of samples is whether the samples are accompanied by price quotations. In *In re Caveney*, 761 F.2d 671, 674–75 (Fed.Cir.1985), samples of a claimed invention were shipped for evaluation along with a catalogue and technical information prior to the critical date, and the purchaser placed an order setting forth prices and quantities of desired product. The court found that the "on sale" bar was applicable even though the goods were not delivered until after the critical date. *See also Buildex Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463–64 (Fed.Cir.1988) ("on sale" bar applicable where prototypes and samples presented for evaluation to manufacturer's engineering staff along with price quotation prior to critical date); *Gould Inc. v. United States*, 579 F.2d 571, 580–81, 217 Ct.Cl. 167 (1978) (firm fixed prices quoted).

The absence of pricing figures, however, does not by itself preclude a finding that the distribution of samples can constitute a bar. In *Strong v. General Elec. Co.*, 434 F.2d 1042 (5th Cir.1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2207, 29 L.Ed.2d 681 (1971), a case not cited by either party, summary judgment for defendant was affirmed where samples of plaintiff's patented meter box had been delivered without charge to a power company for its unrestricted use thirteen months before the application was filed. The inventor contended that the submission of samples constitutes placing "on sale" only if the samples are accompanied by a price quotation and only if submission of samples is the normal way of making sales in the

business. *Id.* at 1047. The Fifth Circuit found that the inventor's submission of the meter boxes to the power company was for the purpose of having the boxes approved, a necessary prerequisite to the power company's purchasing them. Submission of samples for this purpose, the court concluded, constituted placing the boxes "on sale" within the meaning of 35 U.S.C. § 102(b). *Id.*

*Strong* is distinguishable from the present case, however, in that Merck has not suggested that Sander provided Wilcox with the xanthan product in order to obtain Kelco's formal approval for purchase of the product. Merck, further, has submitted no evidence that Sander supplied Wilcox with any price quotations. Defendant attributes the absence of written documentation or price quotations from the record to its financial circumstances in 1981–82, when IFP's inability to afford a secretary prevented it from engaging in much written correspondence. (Sander Dep., Ex. 3 to Merck's On Sale Reply, at 120.) Even if financial constraints did diminish IFP's capacity to generate written materials, however, such circumstances do not excuse Merck's failure here to furnish affidavits that might lend support for the existence of some kind of an oral agreement. In light of the nebulous and indefinite nature of the existing evidence, Merck has not established by clear and convincing evidence that a definite offer was made.

This court recommends denial of this portion of Merck's motion despite misgivings about the quality and adequacy of Zumbro's response to the motion. While acknowledging that a party may not under Rule 56, "proceed to trial on the mere hope that [it] will be able to discredit movants' evidence, but must in opposing a motion for summary judgment be able to indicate to the Court the existence of a triable issue of material fact," *Spalding, Div. of Questor Corp. v. Antonious,* 68 F.R.D. 222, 226–29 (D.Md.1975) (granting summary judgment in a patent case), the court finds nevertheless that Zumbro's extremely brief response raises the factual issue of whether a definite sale actually occurred.

**b. *Was Run No. H220801 (Unifiber) Produced by the Method of Claims 1 and 15 of the '938 Patent?***

Merck contends that Plaintiff's offer to sell the product that was provided as a sample to Merck's Kelco division constitutes only one of two "on sale" events sufficient to invoke the bar to the granting and the validity of the '938 patent. According to Merck, Plaintiff's sale of 5,485 pounds of Unifiber product to Numed for over $2000 at least two weeks prior to the critical date constituted a second "on-sale" event. Merck notes that Sander responded affirmatively when questioned in detail as to whether the Unifiber product was produced by a method that employed each specific step of Claim 1 of the '938 patent.

Plaintiff Zumbro now denies that the manufacture of Unifiber employed the process set forth in Claims 1 or 15 of the '938 patent to produce an agglomerated particle. Citing *UMC Elecs. Co. v. United States,* 816 F.2d 647, 652, 656 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), Zumbro states that the subject matter of the sale or offer to sell must fully anticipate the claimed invention. In arguing that the manufacture and sale of Unifiber for Numed did not anticipate the claimed invention, Zumbro compares the steps involved in processing Unifiber with the express language of the '938 patent's claims.

Claim 15 provides that the agglomerated particle produced by the process shall be "characterized by its quick dispersibility and dissolution into an aqueous solution...."; Zumbro contends, however, that while the Unifiber particle is agglomerated and has a small gum component, the particle itself is largely insoluble cellulose. Insoluble cellulose, reasons Zumbro, renders the particle insoluble. The Unifiber particle thus failed to exhibit the physical characteristic of solubility required by Claim 15, contends Zumbro. Claim 15 also requires wetting the surfaces of the carrier, but Zumbro points out that no wetting occurred during agglomeration. Zumbro adds that in the manufacture of Unifiber, unlike the directions of Claim 15, food grade particulate matter did not operate

as a "carrier" for the vegetable gum particles. (Zumbro's On Sale Response, at 6–7.)

Plaintiff also argues that IFP's production of Unifiber did not employ the steps described in Claim 1. That claim requires "dry blending a food grade particulate carrier and vegetable gum particles to obtain a dry blended mixture," a step which Zumbro asserts did not occur in the manufacture of Unifiber particle. The production of Unifiber, instead, notes Zumbro, involved fluidizing particulate gum and cellulose. Zumbro adds that since maltodextrin (identified by co-inventor Cook as the carrier of the Unifiber particle) was introduced in a liquid solution through the spray nozzle of the Glatt WSG 120 machine, the carrier and gum were not dry blended, as required under Claim 1. (Ex. D to Zumbro's 12(n) On Sale Statement, at 166, 167; Ex. E to Zumbro's 12(n) On Sale Statement, at P008524, 8525, 8523.) Finally, although Claim 1 contemplates that the carrier serve as a carrier with respect to the gum, Plaintiff contends that maltodextrin is not such a carrier. (Zumbro's On Sale Response, at 6–7.)

Defendant Merck contends that Zumbro has failed to raise a genuine issue of material fact. Merck places great weight in Sander's admissions that Run No. H220801 was produced by the methods of Claims 1 and 15 of the '938 patent. Merck argues that a side-by-side comparison between the language of Claim 1 and the identical testimony from Sander's deposition demonstrates as a matter of law that Sander admitted that Run No. 220801 of July 27, 1982 was prepared by the method of Claim 1 of the '938 patent. Similarly, Merck contends, a comparison between the language of Claim 15 and identical Sander deposition testimony also shows as a matter of law that Sander admitted that the Unifiber run was prepared by the method of the '938 patent. (Merck's On Sale Reply, at 3–4.)

Significantly, Zumbro contends in its brief that the Unifiber product was not made by the claimed method because that product was an insoluble agglomerated particle. Plaintiff fails to submit any affidavits, however, to contradict the crucial testimony of co-inventor Sander that every step of the claimed method was followed in producing the Unifiber product.

The circumstances here resemble those in *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir.1983), which also involved a situation where plaintiff was confronted with unequivocal testimony by the inventor that every step of the claimed method was followed in producing the Unifiber product that was offered for sale prior to the critical date. Although plaintiff in *D.L. Auld Co.* submitted affidavits seeking to "clarify" the inventor's testimony, the court found that such submissions did not create a genuine issue of material fact:

> The effort here to staunch the fatal wound inflicted upon [plaintiff's] suit by [the inventor's] deposition testimony is not new to the law. In *International Harvester Co. v. Deere & Co.*, 478 F. Supp. 411 (D. Ill. 1979), *vacated on jurisdictional grounds*, 623 F.2d 1207 (7th Cir.1980), the court held that no genuine issue of material fact was created by affidavits contradicting admissions of the patent owner and inventors. In the present case, [plaintiff's] affidavits do not contradict the crucial testimony of the inventor and are thus even less capable of creating a genuine issue of material fact.

*Id.* at 1151. Significantly, although Merck's motion for summary judgment hailed *D.L. Auld Co.* as controlling and dispositive, Zumbro failed in its response brief to address that case at all. Since Zumbro has not submitted a single affidavit to contradict inventor Sander's important testimony, Zumbro's mere assertions concerning Sander's deposition "are thus even less capable [than cases like *International Harvester Co.*] of creating a genuine issue of material fact." *Id.*

Nor can Plaintiff counter Dr. Sander's deposition testimony that the Unifiber run was prepared by a method that employed cellulose, which functioned as the carrier, and that the '938 patent envisioned cellulose as a carrier. As Merck demonstrates, Dr. Sander

himself testified that Solka–Floc [19] (cellulose) acted as a carrier in the Unifiber process:

Q. And the process that you used included dry blending a food grade particulate carrier, cellulose [Solka–Floc], correct?

A. Correct.

(Merck's 12(m) On Sale Statement, ¶ 27, citing Ex. O to Merck's 12(m) On Sale Statement, at 344.)

Q. And the process that you used was you agglomerated vegetable gum particles with a food grade particulate carrier in a fluidized-bed dryer?

A. By your definition of carrier, yes.

Q. Okay. By the definition of cellulose in the patent, correct?

A. Correct.

(*Id.* ¶ 28, citing Ex. Q to Merck's 12(m) On Sale Statement, at 346.)

Zumbro's sole basis for disputing Sander's testimony is a portion of the deposition of co-inventor Douglas Cook, who stated that "Maltodextrin is a carrier in the case for the cellulose." (Ex. D to Zumbro's 12(n) On Sale Statement, at 155.) Cook's statement, however, refers to the function of maltodextrin; it does not address the function of cellulose nor does it demonstrate that Solka–Floc did not function as a carrier with regard to gum in the agglomerated particle. Zumbro has not shown the existence of any genuine issue of material fact concerning Sander's statement that cellulose functioned as a carrier in Run No. H220801 of July 27, 1982 that produced Unifiber.

### (i) ¶ 27 of Merck's Rule 12(m) On Sale Statement

Zumbro disputes ¶¶ 27 and 28 of Merck's 12(m) On Sale Statement and argues that the dispute precludes summary judgment for Merck.[20] In particular, Zumbro disputes the following factual assertion made by Merck in ¶ 27 of Merck's Rule 12(m) On Sale Statement:

> 27. Sander admitted that the method that was used to prepare the Unifiber product on the first run [Run No. H220801] of July 27, 1982 was for the purpose stated in the preamble of claim 1 and that the method that was used to prepare the Unifiber product employed every step of claim 1 of the '938 patent: [Excerpts from transcript deleted].

Zumbro challenges this characterization of Sander's testimony,[21] contending that "Dr. Sander does not state a purpose of improving dispersion of the Unifiber product." (Zumbro's 12(n) On Sale Statement, ¶ 27.) In support, Zumbro cites to a portion of Sander's earlier deposition testimony, in which Sander does not expressly use the word "purpose" when characterizing the qualities of the Unifiber particle. (Ex. C to Zumbro's 12(n) On Sale Statement, at 323.) [22]

19. Solka–Floc, according to Merck, is a brand of cellulose available in food grade particulate form. (Ex. 2 to Merck's On Sale Reply.)

20. Although Zumbro raised these contentions in its Rule 12(n) Response, it did not address them anywhere in its memorandum in opposition to Merck's motion for summary judgment. To the extent that Zumbro challenges the assertions in Merck's 12(m) On Sale Statement, therefore, the court is limited to the short responses submitted by Zumbro in its 12(n).

21. As Defendant points out on page seven of its Reply, Zumbro apparently does not dispute the portion of ¶ 27 in Merck's 12(m) On Sale Statement that states that "the method that was used to prepare the Unifiber product employed every step of Claim 1 of the '938 patent: ...." These circumstances resemble those in *D.L. Auld Co.*, which held that the inventor's patent was commercially exploited and invalid for purposes of 35 U.S.C. § 102(b) where plaintiff's affidavits "fail[ed] to contradict [the inventor's] crucial testimony that every step of the claimed method was followed in producing [the product embodying the invention to a third party]." *D.L. Auld Co.*, 714 F.2d at 1151. Similarly, here, Zumbro not only has not provided any affidavits challenging Sander's testimony, but it has also not properly disputed the portion of ¶ 27 asserting that the Unifiber production process followed each step of Claim 1. Sander's admission that "every step of Claim 1 of the '938 patent" was used to prepare the Unifiber product of Run No. H220801, which IFP subsequently sold (Zumbro's 12(n) On Sale Statement, ¶ 34) fourteen days prior to the critical date (*id.* ¶ 35), confirms commercial exploitation of the '938 patent prior to the critical date.

22. Zumbro's citation in ¶ 27 of its 12(n) Statement draws upon the following exchange during Sander's deposition:

Q: All right. If I—well, let me ask you this. I hate to have to do this then. In doing it, did you produce a particle—was it a process for

Zumbro's gloss on Sander's testimony, however, cannot be reconciled with Sander's own responses to questions that were raised only twenty pages later in his deposition concerning the Unifiber production process:

Q: Did you use a process for producing a particle having a vegetable gum component?

A: Correct.

Q: And the particle being characterized by quick dispersion in an aqueous solution?

A: That's correct.

(Merck's 12(m) On Sale Statement.) The language of the deposition on which Zumbro relies (*see supra* note 22) is completely consistent with this testimony. The plain language of Sander's testimony suggests that quick dispersibility was indeed a purpose of the Unifiber product. Zumbro has offered no alternative explanation as to what other purpose the patented process may have had. Nor has Zumbro identified any inconsistencies between Sander's deposition passage cited by Zumbro in its 12(n) On Sale Statement and the passage cited by Merck in its Rule 12(m) On Sale Statement. Both passages, in fact, acknowledge that the particle is "characterized by quick dispersion in an aqueous solution." Zumbro's semantic dispute is unsupported and fails to raise any genuine issue of material fact.

**(ii) ¶ 28 of Merck's Rule 12(m) On Sale Statement**

In its 12(n), Zumbro also disputes the assertion concerning Claim 15 made in ¶ 28 of Merck's 12(m) On Sale Statement:

28. Sander admitted that the Unifiber run of 7/27/82, Run No. H220801, as reflected in Exhibit H (DDX 66), was for the purpose stated in the preamble of Claim 15 of the '938 patent and that it employed every step recited in Claim 15 of the '938 patent: [Testimony/Claim 15 comparison omitted.

In disputing this assertion, Zumbro offers as its sole response the following statements: "Dr. Sander's testimony does not indicate a purpose. Exhibit H does not reflect employment of every step recited in claim 15." (Zumbro's 12(n) On Sale Statement, ¶ 28.) Zumbro's reference to Exhibit H of Merck's 12(n) On Sale Statement appears to relate to one of the three run sheets completed by IFP for Run No. H220801; Zumbro, however does not identify what information in the run sheets is relevant nor does it explain why the run sheets do not reflect employment of every step recited in Claim 15.

Again, Zumbro submits no affidavits or citations to other materials in the record. For the reasons discussed above in regard to Count 1, Plaintiff cannot rest solely upon its denial in order to create a genuine issue of material fact. *See D.L. Auld Co.*, 714 F.2d at 1151. Zumbro has not properly disputed Merck's characterization of Sander's deposition testimony in regard to Claim 15, and thus no genuine issue of material fact has been raised.

***Recommendation***

Plaintiff Zumbro has failed to raise a genuine issue of material fact in response to Merck's motion for summary judgment of invalidity based upon commercial exploitation of the '938 patent prior to its critical date. While Merck should not prevail on its argument that Sander's providing a sample of xanthan to Kelco constitutes an "on sale event," there is no dispute of fact that the Unifiber product was produced according to steps claimed in the patent. Thus, its sale violated the "on sale" bar. Accordingly, should the court reach the issue, Merck's motion should be granted.

***MOTIONS FOR SUMMARY JUDGMENT OF VALIDITY, INFRINGEMENT, AND NON-INFRINGEMENT***

In addition to its motions for summary judgment of invalidity, Merck has moved for

producing a particle having a vegetable component?

A: Yes.

Q: A particle characterized by quick dispersion in an aqueous solution?

A: Yes.

(Ex. C to Zumbro's 12(n) Statement, at 322).

a summary judgment declaring that it has not infringed Zumbro's patent. Zumbro, for its part, has filed its own motion for a summary judgment declaring the patent valid and declaring that Merck has infringed it. Facts relevant to this motion include a description of the patented process and of Merck's process, challenged here.

**A. Facts Relating to Validity and Infringement**

The '938 patent claims a process for agglomerating a particle which includes the step of "dry blending a food grade particulate carrier and vegetable gum particles...." ('938 patent, col. 9, lns. 19–21.) The agglomerated carrier/gum particles "keep the vegetable gum particles separate from each other and minimize the surface area of the gum particles available for hydration with water." (*Id.* col. 2, lns. 49–53.) A review of the '938 patent examples demonstrates that rapid dispersion of the vegetable gum in water is achieved when the particulate carrier to vegetable gum ratio is greater than 1:1.

The '938 patent specification defines "vegetable gum" as including "highly soluble gums in particulate form that are synthetically produced or naturally occurring carbohydrate polymers of high molecular weight which are commonly used as viscosity control agents in food." (*Id.* col. 2, lns. 60–63.) The patent also provides a definition of "food grade particulate carrier." Under the patent's definition, such "carriers" include "foodstuffs that are generally produced in a fine grain form and are recognized as suitable for human consumption, such as starch." (*Id.* col. 3, lns. 4–6.) Starch, in turn, is described in the patent as including "those polysaccharides obtained from plants which are partially or completely hydrolyzed to D-glucose. Modified starches (such as maltodextrins, corn syrup solids and dextrose) in particulate form are included...." (*Id.* col. 3, lns. 6–11.)

In the patented process, a "food grade particulate carrier" is a substance that is explicitly used to carry the vegetable gum and help it to go into solution. One of the functions of the "food grade particulate carrier" in the '938 patent is to separate the gum particles from one another. It is undisputed that, as of the time they filed the '938 patent, Sander and Cook did not consider the term "food grade particulate carrier" to include a vegetable gum. Further, none of the examples listed in the '938 patent specify the use of vegetable gum as a "food grade particulate carrier." Example 27 of the '938 patent, in which only xanthan gum particles were used, states explicitly that "no carrier" was used in the example.

Zumbro alleges that Merck infringed its patent and induced "others" to infringe, namely Glatt Air Techniques, Inc. ("Glatt"). Glatt is in the business of selling fluidized bed equipment. In addition, Glatt offers its New Jersey facility to process products on a fee or "toll manufacturer" basis. Pursuant to an exclusive contract between Kelco and Glatt, Kelco ships xanthan gum powder from its plants to Glatt. Glatt then agglomerates this xanthan gum powder in accordance with Kelco's Master Production Process specifications.

The first step of that process involves homogenizing xanthan gum powder until no lumps are present. (Ex. O to Merck's 12(m) Non–Infringement Statement.) The homogenized xanthan gum powder is then treated in a Glatt Powder Coater/Granulator fluidized bed system (GPCG 300) with a binder solution of water and xanthan gum in a single continuous spray, followed by a single drying step. The product formed by the agglomeration process, Keltrol RD, is a 100 percent xanthan gum product. (Ex. M to Merck's 12(m) Non–Infringement Statement, at 2.)

**B. Analysis of Zumbro's Motion for Summary Judgment of Validity**

Zumbro's motion for summary judgment seeks, first, a declaration that the presumption of validity with regard to the '938 patent has not been rebutted. Zumbro argues, further, that there are no disputes of material fact regarding its claim that Defendant Merck infringed its patent on the ground that the agglomeration process used by Glatt to produce Merck's product (Keltrol RD) directly infringed Claims 1, 2, 15, 18, 26, and 27 of the '938 patent.

A patent is presumed valid. 35 U.S.C. § 282.[23] This presumption of validity places on the party asserting invalidity the burden of persuasion and the burden of going forward with proof of facts. *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951 (Fed.Cir.1990). The presumption is viewed as a procedural device; it does not constitute substantive evidence to be weighed against a challenger's evidence. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1562 (Fed.Cir.1988). "Nevertheless, a patent having issued, the challenger bears the burden of persuasion that the established facts lead to a conclusion of invalidity." *Id.* The challenger must produce clear and convincing evidence of facts capable of overcoming the presumption of patent validity. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549 (Fed.Cir.1983). The patentee has no initial burden to prove validity; it need come forward only after a prima facie case of invalidity has been made. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983).

Merck contends that Zumbro's motion for summary judgment must be denied because Merck has presented clear and convincing evidence based upon the inventors' admissions of record that the patent is invalid for violating the "best mode" requirement, 35 U.S.C. § 112, and the "on-sale" provision, 35 U.S.C. § 102(b). Because this Report recommends that the court grant Merck's motion for summary judgment based on the patent's failure to meet the "best mode" requirement, Zumbro's motion for summary judgment of validity here must be denied. As the court stated in *Stratoflex, Inc.*, 713 F.2d at 1534 n. 3, "It is not necessary to hold 'valid' a patent that on another record may be shown to have been invalid. If the burden imposed by § 282 is carried, the patent should be declared invalid."

Merck has presented further evidence which it contends may also sustain a finding of invalidity and thereby provide independent bases for denial of Zumbro's requested summary judgment motion. Although the court need not reach the question of whether this additional evidence meets the clear and convincing standard, this Report will address the additional agreements briefly for purposes of completeness.

### 1. *Pertinent Prior Art Patents Not Considered by the Patent Examiner*

Merck asserts, first, that three specific pertinent prior art patents "never found" by the examiner invalidate the '938 patent. (Defendant's Response to Memorandum to Plaintiff's Motion for Summary Judgment of Infringement and Validity ("Merck's Infringement Response"), at 4.) Merck points out that in the first Patent Office action, mailed in October 1984, the Examiner rejected all the claims of the application on the basis of obviousness. (Merck's 12(n) Infringement Statement, ¶ 49). In responding to this rejection, Sander argued in an amendment that the references cited by the Examiner "neither taught nor suggested ... the important steps of intermittently spraying the mixture with a liquid and permitting the particles to dry between spraying intervals in a fluidized bed caused by a *gaseous* stream." (*Id.* Ex. C to Merck's 12(n) Infringement Statement, at 8–9.) Merck argues, however, that the process which Sander described to distinguish his application from earlier patents was in fact claimed in three patents[24] not cited by the examiner that concerned the agglomeration of starchy carbohydrates. (Merck's Response, at 6.)

23. 35 U.S.C. § 282 provides in part:
A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

24. These three patents include (1) D.E. Wurster et. al., "Process for Preparing Agglomerates," U.S. Pat. No. 3,207,824, Sept. 21, 1965; (2) C.H. Milton, "Method of Preparing an Agglomerated Food Product," U.S. Pat. No. 3,359,119, Dec. 19, 1967; and (3) K.M. Armstrong et. al., "Agglomerated Particulate Materials and Method for Making Same," U.S.Pat. No. 3,391,003, July 2, 1968.

Zumbro responds that Merck has presented no evidence to support the conclusion that the references were "never found" by the examiner. (Plaintiff's Reply Memorandum to Defendant's Response Memorandum to Plaintiff's Motion for Summary Judgment of Infringement and Validity ("Zumbro's Infringement Reply"), at 2.) In support of this response, Zumbro cites the Federal Circuit's decision in *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 885 (Fed.Cir.1984). In *Lear Siegler*, the holder of a patent for a brake unit sued a brake assembly manufacturer ("Aeroquip") for infringement. Judge Shadur, writing for the District Court, had found that Aeroquip's patent, while constituting the closest prior art to Lear Siegler's patent, had not been before the examiner who permitted the Lear Siegler patent to issue. *Id.* at 884. The Federal Circuit regarded as erroneous Judge Shadur's conclusion that Lear Siegler's patent should not be entitled to the presumption of patent validity as a result of the examiner's not having cited Aeroquip's patent. "The failure [of the patent examiner] to cite specific prior art is not conclusive proof that the art was not considered.... [T]he introduction at trial of prior art even more pertinent than that considered by the examiner does not destroy the presumption of validity or shift to the patentee the basic burden of persuasion on invalidity." *Id.* at 885; *see also Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549 (Fed.Cir. 1983) (introduction of art or other evidence not considered by Patent Office does not change patent challenger's burden and does not alter requirement that the challenger's evidence "establish presumption-defeating facts clearly and convincingly"). Accordingly, the fact that the examiner here did not cite the three prior patents need not rebut the presumption of patent validity.

Zumbro notes further that the '938 patent, unlike the three uncited patents to which Merck alludes, seeks to improve the dispersion of gum in water. Zumbro points out that the uncited patents are for processes of agglomeration of acid particles with carbonates, or agglomeration of starch with other substances. Notably, Zumbro urges, these patents do not mention gums. These patents thus do not recognize the possibility of improving gum dispersion by agglomeration, Zumbro argues. (Zumbro's Infringement Reply, at 4.)

The absence in the examiner's record of any mention of the three patents does not constitute clear and convincing evidence that the examiner never considered this prior art or that this art was more pertinent than the prior art that was considered. As a result, Merck's argument on this ground does not defeat the presumption of validity.

### 2. *Invalidity of Claims 26 and 27 Based on Uncited Pertinent Prior Art*

Merck's second argument in opposition to Zumbro's motion is that other pertinent prior art patents not cited by the examiner invalidate Claims 26 and 27. As more fully addressed in the court's discussion of Merck's motion for summary judgment of non-infringement, *see infra* p. 1423–29, Claims 26 and 27 of the patent are arguably not sufficiently supported by the specification and therefore should be disregarded. For the reasons expressed in the foregoing section, however, the fact that the Patent Office did not cite pertinent prior art does not, by itself, constitute clear and convincing evidence of facts which overcome the presumption of patent validity.

### 3. *IFP's Agglomeration for T.J. Lipton Prior to the Critical Date*

Merck's third argument relies on another instance of pre-critical date sales activity.[25] Specifically, Merck contends, Sander's company, IFP, agglomerated gum with particulate carrier according to the process of the '938 patent, and shipped some 800 pounds of the product to the T.J. Lipton Company prior to August 17, 1982, the critical date of the patent. (Merck's Infringe-

25. Curiously, Merck introduces the circumstances of the Lipton transaction in its response to Zumbro's motion for summary judgment, rather than as support for its own summary judgment motion of invalidity based upon the commercial exploitation of the '938 invention prior to its critical date. *See* discussion of this motion *supra* pp. 1407–16. The rationale for Merck's decision to segregate its "on-sale" arguments is not apparent.

ment Response, at 7.) Since IFP billed, and was paid, for this agglomerated gum/particulate carrier product prior to the critical date, Merck contends that it has established a prima facie case of patent invalidity under 35 U.S.C. § 102(b).

Zumbro sets forth a litany of disagreements with Merck's characterization of the July 30, 1982 purchase order as involving a commercial product: the work was identified in the order as "trial work"; there were no charges for the product, only for use of the agglomerating equipment for one day; the bill of lading identified the product as "experimental product not for resale"; and the product could not have been delivered to T.J. Lipton before the critical date of the patent, August 17, 1982. (Zumbro's Infringement Reply, at 9–10.)

***Recommendation***

As discussed earlier, Merck has moved on its own behalf for a summary judgment of invalidity based on Zumbro's commercial exploitation of the alleged invention prior to the critical date. This Report recommends that that motion be granted in part and denied in part. As the discussion of that motion demonstrates, disputes of material fact regarding sales preclude summary judgment in favor of Zumbro on this score.

### C. Analysis of Zumbro's Motion for Summary Judgment of Infringement

#### 1. *Standards for Summary Judgment of Infringement*

In a motion for summary judgment of infringement, "[t]he patentee bears the burden of proving infringement by a preponderance of the evidence." *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1123 (Fed.Cir.1985). The party opposing the motion must identify an evidentiary conflict in the record; mere denials or conclusory statements are inadequate. *Id.* at 1116. Because infringement itself is a factual issue, however, the court must approach a summary judgment motion of infringement or non-infringement with a care proportionate to the likelihood that the motion is not an appropriate method of resolving the particular dispute. *Id.*

#### a. *Literal Infringement*

In order for a court to find infringement, plaintiff must show that the accused product or process exhibits every limitation in the claim or its substantial equivalent. *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577; *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1259 (Fed.Cir.1989). An infringement analysis involves two inquiries: whether the claims have been properly construed to determine their scope, and whether each limitation of the properly construed claims is found in the accused process. *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. denied,* ––– U.S. ––––, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). The first inquiry, interpreting the meaning of the claims, is a legal question. The second inquiry, whether the properly interpreted claims encompass the accused process, is a fact issue. *Id.; Vieau v. Japax, Inc.,* 823 F.2d 1510, 1515 (Fed.Cir.1987). A summary judgment on that issue should be approached with great care by the district court. *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985).

#### b. *Claim Interpretation*

A claim is interpreted in the light of the claim language, the other claims, the prior art, the prosecution history, and the patent specification. Once it has been interpreted in this context, the claim is applied to the accused device or process to determine whether infringement has occurred. *SRI Int'l,* 775 F.2d at 1118; *Medi USA, L.P. v. Jobst Inst., Inc.,* 791 F.Supp. 208, 211 (N.D.Ill.1992) (Norgle, J.). If a genuine dispute concerning any underlying factual matters exist, summary judgment on the infringement issue would be inappropriate. *Hormone Research Found.,* 904 F.2d at 1562.

Zumbro moves for summary judgment of infringement on the ground that the agglomeration process used by Glatt to produce Merck's product (Keltrol RD) directly infringes Claims 1, 2, 15, 18, 26, and 27 of the '938 patent. In support of this motion,

Zumbro claims to rely upon four sources: (1) a run sheet reflecting a production run used to create Keltrol RD (Ex. H to Zumbro's 12(m) Infringement Statement), (2) statements from paragraphs 25 and 26 from Merck's 12(m) Statement allegedly acknowledging that Keltrol RD is an xanthan gum product and that xanthan gum is a vegetable gum,[26] (3) deposition testimony of Kenneth Olson, Executive Vice President and Chief Operating Officer of Glatt, in which Olson acknowledged the possibility that Glatt's process of producing Keltrol RD infringed the '938 patent, and (4) deposition testimony of both Olson and Merck employee Jerry Lucas, Senior Research Engineer at Kelco, comparing the process steps claimed in Claims 1 and 15 of the '938 patent with the process used in preparing Keltrol RD. (Zumbro's Memorandum in Support of Plaintiff's Motion for Summary Judgment of Infringement and Validity, ("Zumbro's Infringement Memorandum"), at 13–17.)

In its response, Merck contends that Zumbro has not met its burden of proving infringement by a preponderance of the evidence. *SRI Int'l,* 775 F.2d at 1118. Merck raises three specific challenges to Zumbro's contention that there are no genuine disputes of material fact regarding Zumbro's claim that Merck's process infringes Zumbro's patent.

**(i) The Meaning of "Intermittent Spraying"**

First, Merck argues that a genuine issue of material fact exists as to the meaning of Zumbro's claim limitation "intermittently spraying." This claim limitation, Merck contends, cannot be found in Merck's own process, because Merck's process has one continuous, uninterrupted spray. (Merck's Infringement Response, at 10). According to Merck, the claim limitation "intermittently spraying" describes a known method of operating the WSG (Zumbro) agglomerating equipment used by Sander and Cook. Zumbro does not dispute the assertion in Merck's 12(n) Statement that the WSG has filters which require frequent shaking during which the air flaps are closed and the spray is shut off for several seconds. (Merck's 12(n)(2) Infringement Statement, ¶ 76, Zumbro's 12(m) Infringement Statement, ¶ 76). It is undisputed that the spray interval (the duration of spraying until the nozzle is shut off) with the WSG machine can range from a few seconds to as long as sixty seconds.

Zumbro insists that the continuous spray used by Merck does not require a conclusion that Merck's process does not infringe the patent. According to Zumbro, "intermittent" need not be limited to intervals of time; Zumbro submits that the term also refers to intervals of space. (Zumbro's Infringement Reply, at 13.) Although the term "intermittent" is not defined anywhere in the patent, Zumbro now urges that "intermittently spraying" describes the random movement of individual particles in the fluidized bed as they move into and away from contact with individual water droplets. In its motion for summary judgment, Zumbro states:

> [I]t is clear that intermittently spraying and drying the mixture *does not require* turning off the nozzles which spray the wetting agent onto the fluidized bed. Intermittent spraying and drying occurs when the particles in the fluidized bed move into the spray of wetting agent (i.e. spraying) and when they randomly move out of contact with the spray of wetting agent but remain exposed to the stream of hot air (i.e., drying).

(Zumbro's Infringement Memorandum, at 13.) This contention is a curious one; although Zumbro asserts that the patent language "does not require" that the spray nozzles be shut off, neither does Zumbro deny that shutting off the nozzles was precisely what the process did involve.

Merck insists that there is a genuine dispute of fact regarding the meaning of the expression "intermittently spraying." Merck draws attention to the admitted typographi-

26. Although Zumbro asserts that Merck made these admissions in paragraphs 25 and 26 of its Local Rule 12(*l*) Statement accompanying Merck's motion for summary judgment, this court is unable to locate such statements in paragraphs 25 or 26 of *any* of Merck's three 12(m) Statements.

cal error[27] that appears in two confusing sentences from Example 1 of the patent:

> . . . The residence time of the particles under the spray nozzle was approximately 35 seconds following each 35 second spray interval. A three second filter shake interval removes fines from an air/product separation filter.

('938 patent, col. 4, lns. 41–45.) Merck submits that the sentences do make sense if repunctuated as follows:

> The residence time of the particles under the spray nozzle was approximately 35 seconds[.] [F]ollowing each 35 second spray interval[,] [a] three second filter shake interval removes fines from an air/product separation filter.

(Merck's Infringement Response, at 12.) As the non-moving party, Merck is entitled to the benefit of all inferences from the evidence. *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 973 (Fed.Cir.1985). Zumbro has not established the absence of a genuine issue of material fact as to the meaning of "intermittently spraying."

**(ii) Internal Operation of the WSG Process and the GPCG Process**

Merck next contends that there is a genuine issue of fact as to what actually occurs inside the agglomerator, either in the WSG (Zumbro) process or in the GPCG (Merck) process. The patent itself concedes that the interaction between gum and carrier particles inside the steel chamber of the WSG was "not known":

> Although the exact mechanism of agglomeration is not known, the following explanation is believed to be true.

('938 patent, col. 3, lns. 46–47.) Zumbro is unable to explain the internal operation of its own machine, Merck argues, and can only "grasp at inferences to support its inventors' speculation and to infer that a similar mechanism occurs in Merck's GPCG process." (Merck's Infringement Response, at 12.)

Zumbro has not effectively countered Merck's argument that the language of the specification is tentative and that there is a dispute regarding whether the internal operation of the two machines is the same. "[W]hen the meaning of a term in the claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises, and construction of the claim should be left to the trier or jury. . . ." *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985.) Lacking direct evidence to sustain its interpretation of how agglomeration takes place inside the WSG or GPCG, Merck contends that Zumbro has not demonstrated that the mechanism of agglomeration in the GPCG process infringes or even resembles that which takes place in the WSG process. (Merck's Infringement Response, at 12–13.) Neither party has cited any case law concerning this question of whether a patentee must actually understand every step in the process in order to charge another party using a similar process with infringement. On the other hand, Zumbro has not rebutted Merck's contention, that there is no dispute of a genuine issue of material fact on this issue.

**(iii) Absence of Particulate Carrier in Keltrol RD**

Merck also contends that Keltrol RD, the accused product, lacks the particulate carrier that represents an express claim limitation in the '938 patent. Because a particulate carrier is not present in Keltrol RD, Merck suggests, Zumbro may not apply this claim limitation literally to Merck's accused process. (Merck's Infringement Response, at 13.) Thus, notes Merck, Zumbro's memorandum in support of summary judgment characterizes the language of the patent claim not as "(1) dry blending a particulate carrier and a vegetable gum. . . ."—as appears in the patent itself—but rather in the form of a broader hypothetical claim: "(1) Dry Blending the Materials." (*Id.* at 14, Zumbro's Infringement Memorandum, at 12–14.) Merck charges that Zumbro's omission of the "particulate carrier" limitation from the literal claim is unauthorized and improperly increases the number of processes that

27. Zumbro admits in paragraph 78 of its 12(n) Non-Infringement Statement that the sentence appearing at lines 41–43 of column 4 contains a typographical error; Zumbro does not identify the error, however.

Zumbro might characterize as equivalents of its own.[28] As Merck points out in its response, Zumbro may not resort to this hypothetical claim language because it has not first met its burden of distinguishing relevant prior art patents, as required by the doctrine of equivalents. Under that doctrine, if a hypothetical patent claim (whose literal meaning is sufficient in scope to cover the accused product) would not have been allowed by the Patent and Trademark Office over prior art, a patentee cannot obtain that coverage in an infringement suit. *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684 (Fed.Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). Zumbro's hypothetical claim is therefore impermissibly broad, raising yet another issue of material fact.

In sum, Zumbro has not met its burden of showing the absence of any issue of material fact regarding infringement.

### D. Analysis of Merck's Motion for Summary Judgment of Non-Infringement

Merck itself has moved for summary judgment of the issue of infringement. Merck contends it is entitled to judgment declaring it has not infringed the '938 patent because Kelco's accused product, Keltrol RD, is not made by a process that is claimed in the '938 patent. Citing *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed.Cir.1989), Merck asserts that if the patentee's proof is deficient in satisfying an essential part of the legal standard for infringement, the motion of an accused infringer for summary judgment on the ground of non-infringement may be granted.

Merck urges that the claims of the '938 patent require two components or elements: a "food grade particulate carrier" and a "vegetable gum." Since Kelco's process employs 100 percent xanthan gum, Merck argues that Keltrol RD does not use an essential element of Zumbro's claim—a "food grade particulate carrier." Merck adds that the specification and sworn testimony of the inventors negates any construction of the "food grade particulate carrier" as also including a vegetable gum.

Zumbro contends that Merck's interpretation of the claims is too narrow; Zumbro insists that the express claims of the patent cover a product and process in which both the food grade particulate carrier and the vegetable gum are xanthan. Additionally, Zumbro argues, without any specific citations, that the prosecution history of the patent supports a claim interpretation in which the definition of a food grade particulate carrier includes xanthan gum.

#### 1. *Whether Zumbro's Claims Require Both a "Vegetable Gum" and a Separate "Food Grade Particulate Carrier"*

As described above, in an infringement analysis, the claim language must first be interpreted. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed.Cir.1989). The words of the claim describe the invention by a series of limiting words or phrases ("limitations"). *Id.* Merck argues that Zumbro's claims, when properly construed, require both a "vegetable gum" and a separate "food grade particulate carrier." Merck points out that the '938 patent contains only two independent claims,[29] Claims 1 and 15, both of which recite limitations to a "vegetable gum" component and a "food grade particulate carrier" component. Claim 1 concerns a process for producing a particle having a vegetable component that involves "dry blending a food grade particulate carrier and vegetable gum particles to

28. Even if some limitations of the patent claim are not literally satisfied, infringement may still be found in certain situations under the doctrine of equivalents. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821–22 (Fed.Cir.), *reh'g denied* (1992). The doctrine of equivalents may be invoked by a patentee who brings an infringement charge against the producer of a device which "performs substantially the same function in substantially the same way to achieve substantially the same result." *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir.1991).

29. An independent claim provides the basis from which all other claims of the patent depend. A dependent claim, by contrast, relates back to and further limits an independent claim or another dependent claim in the same patent application. Ronald B. Hildreth, *Patent Law: A Practitioner's Guide* 185 (1988).

obtain a dry blended mixture; ...." ('938 patent, col. 9, lns. 19–21). Similarly, the process defined in Claim 15 involves "agglomerating vegetable gum particles with a food grade particulate carrier in a fluidized bed dryer...." (*Id.* col. 10, lns. 15–16.) Since all claims of the '938 patent ultimately depend upon Claim 1 or Claim 15, Merck argues that all of the patent's claims incorporate the limitations to a "vegetable gum" and to a "food grade particulate carrier." (Defendant Merck's Motion and Memorandum for Summary Judgment of Non–Infringement of the '938 Patent ("Defendant's Non–Infringement Motion"), at 8.)

Zumbro insists that the claims of the '938 patent do cover a process and a product wherein the food grade particulate carrier is a vegetable gum. In support of this contention, Zumbro engages in inductive reasoning: (1) Claims 26 and 27 expressly claim a process in which the food grade particulate carrier is vegetable gum, (2) Defendant admits that xanthan is a vegetable gum, (3) Therefore, the claims expressly include a process in which the carrier is xanthan. (Plaintiff's Response Memorandum in Opposition to Defendant's Motion for Summary Judgment of Non–Infringement ("Zumbro's Non–Infringement Response"), at 6.)

As will be discussed below in the discussion of the prosecution history of Claims 26 and 27, *infra* pp. 1427–28, questions remain with regard to the validity of those claims. Consequently, Zumbro has not rebutted Merck's contention that all of the claims of the patent incorporate limitations to a "vegetable gum" and to a "food grade particulate carrier."

### 2. *The Specification's Differentiation of "Particulate Carrier" and "Vegetable Gum"*

Merck argues that the specification teaches that the "particulate carrier" and the "vegetable gum" are distinctly different components. In the specification, "vegetable gum" is defined as "highly soluble gums in particulate form that are synthetically produced or naturally occurring carbohydrate polymers of high molecular weight which are commonly used as viscosity control agents in food." ('938 patent, col. 2, lns. 59–63.) The specification identifies xanthan gum as one type of vegetable gum. (*Id.* col. 3, ln. 2.)

#### a. *Definition of "Food Grade Particulate Carrier"*

Merck asserts that Keltrol RD, its 100 percent xanthan gum product, does not contain a "food grade particulate carrier," as that term is defined in the specification. (Merck's Non–Infringement Motion, at 8.) The specification's definition of the term "food grade particulate carrier," in fact, Merck notes, fails to include a "vegetable gum." The specification provides:

> As used herein, food grade particulate carrier includes those foodstuffs that are generally produced in a fine grain form and are recognized as suitable for human consumption, such as starch. Starch includes those polysaccharides obtained from plants which are partially or completely hydrolyzed to D-glucose. Modified starches (such as maltodextrins, corn syrup solids and dextrose) in particulate form are included within the present invention.

(*Id.* col. 3, Ins. 3–11.)

Zumbro disagrees with Merck's interpretation of this definition. Zumbro argues that the specification supports a claim interpretation in which the term "food grade particulate carrier" may include a vegetable gum carrier. Although Zumbro admits that the specification states that "starch is a preferred carrier" (Zumbro's Non–Infringement Response, at 6) and that the specification "does not explicitly recite that 'xanthan gum may be used as the food grade particulate carrier' " (*Id.* at 9), Zumbro nevertheless contends that other particulate carriers besides starch can be used. Zumbro refers to language in the specification's definition of "food grade particulate carrier" stating that the term includes "foodstuffs that are generally produced in a fine grain form and are recognized as suitable for human consumption...." ('938 patent, col. 3, Ins. 4–6.) Zumbro suggests that xanthan gum "fits directly" within that definition. As support for its suggestion that xanthan is "fine grain," Zumbro cites to a portion of one of Defendant's technical bulletins indicating that xan-

than gum is food grade and can pass through a 60 mesh screen. (Zumbro's Non–Infringement Response, at 3; Ex. I to Zumbro's 12(n) Non–Infringement Statement, at 2.) Zumbro adds that xanthan meets the second part of the definition because xanthan gum is "widely recognized" as suitable for human consumption. (Zumbro's Non–Infringement Response, at 7.)

Merck responds that the theory espoused by Zumbro in its brief is controverted by the plain language of the specification. That language belies a construction in which the "food grade particulate carrier" can also be a "vegetable gum." Merck points out that Zumbro's misleadingly characterized the specification's definition of "food grade particulate carrier" by omitting the specific reference to the term "starch" at the end of the definition. Thus, argues Merck, the omitted language and context in Zumbro's characterization reveals that starch, not vegetable gum, is the kind of food grade particulate carrier envisioned by the inventors. (Defendant Merck's Reply Memorandum for Summary Judgment of Non–Infringement of the '938 Patent ("Merck's Non–Infringement Reply"), at 12–13.)

Again, Merck has the better of this argument. The specification's definition of "food grade particulate carrier" envisions a foodstuff such as starch or modified starch. Zumbro has taken the "fine grain form" language of the definition out of context and has made no effort to compare the qualities of xanthan with those of starch. The specification simply does not contemplate the use of xanthan gum as a food grade particulate carrier.

**b. *Function of the Food Grade Particulate Carrier***

Merck also quotes directly from the specification to show that the specification teaches that a particulate carrier contributes to the separation of the gum particles:

> The process of the present invention combines a highly soluble vegetable gum with a food grade particulate carrier such as starch in a unique manner, which decreases the available surface area on the gum particle for immediate contact with water. The process agglomerates a particulate vegetable gum with a particulate starch to form an agglomerated particle wherein the gum particles are separated by the starch particles.

(*Id.* col. 3, lns. 20–27.) According to Merck, the expressly stated function of the starch in the agglomerated particle "is to cause the gum particles to be 'separated' from one another 'by the starch particles.' " (Merck's Non–Infringement Reply, at 15 (quoting from the specification).) Such a function would be impossible if all the particles were identical (i.e., xanthan gum), as in the Keltrol product, reasons Merck, because identical gum particles would stick to, rather than be separated from, one another. *Id.* Thus, Merck reasons, the food grade particulate carrier must be separate and distinct from the particulate vegetable gum used in the '938 patent. (Merck's Non–Infringement Motion, at 9.) Zumbro has not responded to this argument at all.

**c. *May Limitations Be Read into the Claims?***

Even if the specification suggests that the particulate carrier and the vegetable gum were formed of separate, chemically different materials, Zumbro argues that particular limitations or embodiments appearing in the specification should not be read into the claims. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir.1985) (fact that specific examples in patents occur at room temperature does not signify that the claims contain a room temperature limitation).

Zumbro has not identified, however, any particular language in the specification that it believes has been inappropriately read into the claims. To the extent that the parties dispute the true meaning of terms such as "vegetable gum" or "food grade particulate carrier," moreover, "the specification ... can provide relevant information about the scope and meaning of the claim." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 986 (Fed.Cir.1988); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 n. 2 (Fed.Cir.1985) ("Claims are always interpretable in light of the specification and prosecution history of the application that led to the patent.").

Zumbro has not created a dispute of fact regarding the patent's distinction between gum and carrier.

### 3. *The Inventors' Admissions Concerning the Specification's Silence about "Vegetable Gum" Constituting a "Particulate Carrier"*

Merck contends that both Sander and Cook have admitted that Example 27 of the '938 specification does not teach that the food grade particulate carrier may be vegetable gum. Merck notes that both Sander and Cook denied that Example 27 provided support for the limitation recited in Claims 26 and 27 "wherein the food grade particulate carrier is a vegetable gum." At his deposition, Sander responded to the following questions posed by Merck's attorney:

Q. (Showing Sander Exhibit 104, which shows 100 percent gum was used.) This is the run you made for your patent?

A. Correct.

Q. It's Exhibit 104. Where is the carrier?

A. There isn't any.

(Ex. E to Merck's 12(m) Non–Infringement Statement, at 467.) In another exchange, Sander replied to the following question:

Q. Do Examples 23–27 show gum used as a carrier?

A. No.

(*Id.* at 471.) In his deposition, Cook responded similarly:

Q. All right. Can you find any of the examples where the carrier is stated to be a vegetable gum?

A. No.

Q. You can't?

A. I don't believe so. There are no gums listed as carriers.

(Ex. K to Merck's 12(m) Non–Infringement Statement, at 193.)

Zumbro has not responded to Merck's interpretation of the inventors' admissions. Nor has Zumbro addressed Sander's admission that the paragraph in the specification defining "food grade particulate carrier" was presented "in contrast" to the preceding paragraph in the specification which defined "vegetable gum." In his deposition, Sander had the following exchange with Merck's attorney:

Q. All right. And in the preceding paragraph you define what you mean by vegetable gum, do you not?

A. The preceding paragraph, going back to the previous page?

Q. Yes, over on paragraph two. You contrast that with the carrier, do you not?

A. Yes.

Q. All right. At that time you did not consider the carrier to be a gum, did you, at that time, when you filed your patent application?

A. To the best of my recollection, no.

(Ex. J to Merck's 12(m) Non–Infringement Statement, at 479, lns. 16–25, 480, lns. 1–2.) Merck suggests that this deposition testimony constitutes uncontroverted evidence that Sander clearly intended to express a distinction between the two particles discussed in the two separate paragraphs of the specification. (Merck's Non–Infringement Reply, at 14.)

█ In its 12(n) Statement, however, Zumbro does challenge the following statement in paragraph 30 of Merck's 12(m) Non–Infringement Statement:

> No carrier was used in the experiment exemplified by Example 27 of the '938 patent.

Zumbro asserts as the basis for its dispute that "[x]anthan gum was used as a carrier." (Zumbro's 12(n) Non–Infringement Statement, ¶ 30.) In support of this assertion, Zumbro cites to statements made by Z. Peter Sawicki, an attorney with Kinney & Lange, the law firm representing Zumbro in this suit. None of Sawicki's statements cited by Zumbro, however, support Zumbro's 12(n) assertion that xanthan was used as a carrier.[30]

30. In disputing paragraph 30 of Merck's 12(m) Non–Infringement Statement, Zumbro in its 12(n) Non–Infringement Statement cites to four portions of Sawicki's deposition testimony. Two of these four citations offered by Zumbro, however, do not even correspond to a Sawicki statement. The other two hardly lend support for Zumbro's assertion that xanthan was the carrier

In any event, as pointed out by Merck, the statements by Sawicki, a "non-inventor," do not contradict the plain language of Example 27 or the corroborating admissions of both inventors. (Merck's Reply, at 11.) In *International Harvester Co. v. Deere & Co.*, 478 F.Supp. 411 (D.Ill.1979), *vacated on jurisdictional grounds*, 623 F.2d 1207 (7th Cir.1980), the court held that no genuine issue of material fact was created by affidavits contradicting admissions of the inventors and the patent owner. In the present case, Sawicki's deposition testimony does not contradict the crucial testimony of the inventors and is thus even less capable of creating a genuine issue of material fact. *Cf. D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1151 (Fed.Cir.1983) (affidavits filed by plaintiff in effort to clarify inventor's deposition failed to contradict his crucial testimony that every step of the claimed method had been followed in producing sample emblems offered to prospective customers before critical date).

### 4. *The Prosecution History of Claims 26 and 27*

Merck contends, further, that Zumbro cannot rely on contradictory arguments in the prosecution history of Claims 26 and 27 to challenge the plain language of the specification or the admissions of the inventors to the contrary. Merck points out that more than a year and a half after the '938 patent was filed with the Patent Office, Sander and Cook (through their attorney Sawicki) filed an amendment on March 11, 1985 in response to the Patent Office's rejection of their earlier application. The amendment contained two newly added claims, Claims 26 and 27, which recite the limitation "wherein the food grade particulate carrier is vegetable gum." Merck notes that Attorney Sawicki informed the Patent Office that these additional claims did not constitute new matter because they had already appeared in the specification set forth in Example 27. In its motion and memorandum for summary judgment, Merck quotes from Sawicki's amendment:

> Two new dependent claims, 29 and 30 [now 26 and 27] have been added to more clearly claim the applicant's invention, by pointing out that the food grade particulate carriers may be vegetable *gum.* Addition of these claims does not constitute new matter as support for these claims is found on pages 17 and 18 [now column 8] of the specification in Example 27.

(Ex. L to Merck's 12(m) Non–Infringement Statement, at 10.) Merck argues that this argument presented to the Patent Office contradicts Sander's subsequent testimony that "no carrier" was taught by Example 27. (Merck's Non–Infringement Motion, at 12.)

Zumbro denies that anything in the prosecution history limits the claims of the patent. Zumbro merely contends that Claims 26 and 27 expressly claim a process in which the food grade particulate carrier is vegetable gum.[31] Since Defendant admits that xanthan is a vegetable gum, Zumbro asserts, Defendant must also concede that Claims 26 and 27 expressly include a process in which the carrier is xanthan. (Zumbro's Non–Infringement Response, at 6.)

Merck responds that Zumbro has not rebutted the plain language of the specification and the admissions of both Cook and Sander. Contrary to the argument Zumbro made to the Patent Office, Merck continues, the specification of the '938 patent at Example 27 actually states under the column heading "Carrier Type" that the 100 percent xanthan gum product has "no carrier." (*Id.* at 8.) Zumbro does not dispute paragraph 15 of Merck's 12(m) Non–Infringement Statement:

in Example 27. The reference to page 83 of the Sawicki deposition states only that "[a]lthough starch is the preferred carrier, other particulate carriers are operable in the present invention." (Ex. G to Zumbro's 12(n) Non–Infringement Statement, at 83, lns. 8–10.) This statement provides no support for the notion that xanthan itself constitutes an "other particulate carrier." The reference to page 102 of Sawicki's deposition suggests only a conclusion by default that xanthan gum must function as a carrier: At page 102 Sawicki states, "It's kind of common sense that the zanthan [sic] gum is its own carrier. It's 100 percent zanthan [sic] gum." (*Id.* at 102, lns. 8–10.)

31. Claim 26 states: "The process of claim 1 wherein the food grade particulate carrier is vegetable gum." Claim 27 states: "The process of claim 15 wherein the food grade particulate carrier is vegetable gum."

Example 27 of the '938 patent states that "no carrier" was used in the example.

(Zumbro's 12(n) Non-Infringement Statement, ¶ 15; Merck's 12(m) Non-Infringement Statement, ¶ 15.) According to Merck, this portion of Example 27 directly contradicts Zumbro's argument to the Patent Office that Claims 26 and 27 did not present any new matter and that the term "food grade particulate carrier" could appropriately be deemed to include "vegetable gum." (Merck's Non-Infringement Reply, at 8.)

Merck further argues that since Claims 26 and 27 were allowed to issue based upon misrepresentations made to the Patent Office, these claims are invalid because they (1) added "new matter" not disclosed in the specification, in violation of 35 U.S.C. § 132,[32] and (2) are not supported by the specification, in violation of the written description requirement of 35 U.S.C. § 112.[33] (Merck's Non-Infringement Reply, at 10.)

Zumbro has not identified an evidentiary conflict in the record on this issue. It may not rely on mere denials or conclusory statements; accordingly, it has failed to raise a genuine issue of fact with regard to the prosecution history of Claims 26 and 27. *SRI Int'l*, 775 F.2d at 1116.

### 5. *Cancelled Claim 17*

Finally, Zumbro argues that the prosecution history supports an interpretation of the patent in which the term "food grade particulate carrier" may include xanthan gum. Zumbro refers to the language of a claim (Claim 17) from the original application that was subsequently cancelled. Cancelled Claim 17 concerned "[a]n agglomerated particle comprising a structure of individual vegetable gum particles bound to each other and bound to food grade particulate material randomly interspersed among the gum particles...." (Ex. P to Zumbro's 12(n) Non-Infringement Statement, at 21.) Zumbro regards as significant the absence of the term "carrier" from this claim. The omission of this term, Zumbro suggests, indicates that, at the time of filing of the original application, "the particulate material need not have performed any function other than be bound to the gum." (Zumbro's Non-Infringement Response, at 7.) Since xanthan gum particles "can be bonded to one another and carry one another," Zumbro proposes that the carrier can be xanthan. (*Id.* at 7–8.)

Merck responds that cancelled Claim 17 does not rebut the unequivocal admissions of both inventors that Example 27 does not support Claims 26 or 27, nor the plain language of Example 27 itself that "no carrier" was used. (Merck's Non-Infringement Reply, at 11–12.) Merck argues, further, that Zumbro cancelled Claim 17 because the Patent Office, during the prosecution history, had rejected the claim over the prior art Gidlow patent;[34] hence, Merck asserts, only those claims incorporating the "carrier" limitation were allowed to issue.

Zumbro's reliance upon cancelled Claim 17 does not appear to raise an issue of material fact. The claim does not contradict the inventors' admissions that Example 27 did not contemplate the use of vegetable gum as a food grade particulate carrier, nor does the claim challenge the express language of Ex-

32. 35 U.S.C. § 132 (emphasis added), the provision concerning notice of rejection and reexamination, provides as follows:

> Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, the Commissioner shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. *No amendment shall introduce new matter into the disclosure of the invention.*

33. See discussion of this issue at *supra* pp. 1399–1407.

34. The Gidlow patent, U.S. Pat. No. 3,306,958, was filed by Rolf G. Gidlow and is entitled "Agglomerating Process." It was patented on February 28, 1967. (Ex. P to Merck's 12(n).) During the prosecution history of the '938 patent, the Patent Office had rejected Claim 17 over the prior art Gidlow patent:

> Gidlow et al discloses an agglomerate (Fig. 4) which meets the description of claim 17.

(Patent Office Examiner's Action of Oct. 25, 1984, Ex. L to Merck's 12(m) Non-Infringement Statement, at 2.)

ample 27 stating that the 100 percent xanthan gum product had "no carrier."

## Recommendation

The infringement motions present difficult legal questions regarding the proper interpretation of the meaning of claims and factual determinations of whether the properly interpreted claims encompass the accused process. Merck has submitted uncontroverted admissions of both inventors that none of the examples in the '938 patent specify the use of "vegetable gum" as a "food grade particulate carrier." Further, Zumbro has not disputed the admission in Example 27 stating that there is "no carrier" in the agglomeration of 100 percent xanthan gum. Zumbro suggests that a disputed issue of fact exists in regard to the interpretation of the term "food grade particulate carrier" in the specification; Zumbro contends over Merck's objection that xanthan gum (as characterized in Merck's technical publications) meets the "fine grain form" quality described in the specification. Zumbro has not explained, however, how resort to Merck's advertising claims genuinely rebuts the unequivocal admissions of the inventors that no carrier was used to agglomerate the 100 percent xanthan gum of Example 27. Merck has presented substantial support for a summary judgment in its favor on this issue. Because this Report recommends that summary judgment be granted in favor of Merck on another basis, and because the infringement motion raises complicated technical issues, no firm recommendation regarding this motion is made here.

## CONCLUSION

This Report concludes that Defendant Merck has demonstrated that there are no disputes of material fact and that it is entitled to judgment as a matter of law on the issue of the validity of the '938 patent. Specifically, the inventors violated their obligation to disclose the "best mode" for carrying out the patented method. If this court affirms that recommendation, it need not consider issues relating to the remaining motions. If the court should consider the "on sale" issue, however, this Report recommends that the court conclude that Merck has not met its burden of establishing that Zumbro was guilty of commercial exploitation of its patented process prior to the critical date with regard to Run No. H132001, but that Merck has met the burden with respect to the sale of the Unifiber product in July 1982.

Finally, Zumbro's motion for summary judgment declaring that the patent is valid and that Merck has infringed must be denied. The objections set forth in Merck's own two invalidity motions require that Zumbro's motion be denied; further, Defendant Merck has presented additional evidence establishing disputes of material fact regarding the validity of the '938 patent. Zumbro itself has failed to present evidence sufficient to create a dispute of fact regarding Merck's contention that it has not infringed the patent. If the court reaches the infringement issue, it should grant summary judgment in favor of Defendant Merck on that issue.

Date November 13, 1992